IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DR. WARREN G. ROBERTS, M.D., F.A.A.N.S., an individual, and ASPEN SPINE AND NEUROSURGERY CENTER, P.C., an Oregon professional corporation**, | Case No. 3:13-cv-01136-SI |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| **LEGACY MERIDIAN PARK HOSPITAL, INC., an Oregon non-profit corporation, d/b/a/ LEGACY MERIDIAN PARK MEDICAL CENTER, an Oregon assumed business name; DR. FRANCISCO X. SOLDEVILLA, M.D., an individual; NORTHWEST NEUROSURGICAL ASSOCIATES, LLC, an Oregon limited liability corporation, DR. ROBERT L. TATSUMI, M.D., an individual; DR. TIMOTHY L. KEENAN, M.D., an individual; PACIFIC SPINE SPECIALISTS, LLC, an Oregon limited liability corporation; and DR. ANDREW B. CRAMER, M.D., an individual,** | |
| Defendants. | |

PAGE 1 – OPINION AND ORDER

Matthew A. Levin, Lawson E. Fite, and Lauren F. Blaesing, Markowitz, Herbold, Glade & Mehlhaf, P.C., Suite 3000, Pacwest Center, 1211 S.W. Fifth Avenue, Portland, OR 97204. Attorneys for Plaintiffs.

Keith S. Dubanevich and Keil M. Mueller, Stoll Stoll Berne Lokting & Shlachter, P.C., 209 S.W. Oak Street, Suite 500, Portland, OR 97204. Attorneys for Defendants Legacy Meridian Park Hospital, Inc. and Dr. Andrew B. Cramer, M.D.

Robert D. Scholz and Megan L. Farris, MacMillan Scholz & Marks, P.C., 900 S.W. Fifth Avenue, Suite 1800, Portland, OR 97204. Attorneys for Defendants Northwest Neurosurgical Associates, LLC and Dr. Francisco X. Soldevilla, M.D.

Elizabeth E. Lampson and Christopher M. Parker, Davis Rothwell Earle & Xochihua, P.C., 111 S.W. Fifth Avenue, Suite 2700, Portland, OR 97204. Attorneys for Defendant Pacific Spine Specialists, LLC.

Karen M. O'Kasey and Calliste J. Korach, Hart Wagner, LLP, 1000 S.W. Broadway, Suite 2000, Portland, OR 97205. Attorneys for Defendant Dr. Timothy L. Keenan, M.D.

Jeffrey W. Hansen, Stephen R. Rasmussen, and Joseph A. Rohner, IV, Smith Freed & Eberhard P.C., 111 S.W. Fifth Avenue, Suite 4300, Portland, OR 97204, and James L. Dumas and Michael J. Estok, Lindsay Hart Neil & Weigler, LLP, 1300 S.W. Fifth Avenue, Suite 3400, Portland, OR 97201. Attorneys for Defendant Dr. Robert L. Tatsumi, M.D.

**Michael H. Simon, District Judge.**

Dr. Warren G. Roberts, M.D., F.A.A.N.S. ("Dr. Roberts") and Aspen Spine and Neurosurgery Center, P.C. ("Aspen Spine") (collectively, "Plaintiffs") assert 13 claims against the following seven Defendants:  Legacy Meridian Park Hospital, Inc. ("Meridian Park"), Dr. Andrew B. Cramer ("Dr. Cramer"), Dr. Francisco X. Soldevilla, M.D. ("Dr. Soldevilla"), Dr. Timothy L. Keenen, M.D. ("Dr. Kennen"), Dr. Robert L. Tatsumi, M.D. ("Dr. Tatsumi"), Northwest Neurosurgical Associates, LLC  ("Northwest Neurosurgical"), and Pacific Spine Specialists, LLC ("Pacific Spine"). Defendants Meridian Park, Dr. Cramer, and Pacific Spine filed separate motions to dismiss. Dkts. 33, 38, and 47. In addition, Defendant Dr. Tatsumi filed a motion to strike Plaintiffs' initial disclosures or to compel the filing of additional disclosures,

Dkt. 53, and Plaintiffs filed a motion to disqualify counsel for Dr. Keenen. Dkt. 41. This Opinion and Order addresses each of these motions.

## BACKGROUND

In their Third Amended Complaint ("TAC"), Dkt. 28, Plaintiffs allege the following facts, which the Court accepts as true for purposes of the pending motions to dismiss.

Dr. Roberts is an accomplished African-American neurological surgeon who practices medicine in Oregon. Dr. Roberts owns Aspen Spine. TAC ¶¶ 1-2. Dr. Roberts is board certified by the American Board of Neurological Surgery, is a published journal author, and has handled hundreds of cases, including complex spine, vascular, tumor, and skull base procedures. TAC ¶ 13. After serving as chief resident in the Department of Neurological Surgery at Oregon Health Sciences University from 2006 to 2007, Dr. Roberts moved to Colorado to practice medicine. TAC ¶ 14. In March 2011, Dr. Roberts returned to Portland and obtained clinical privileges at both Meridian Park and Columbia Memorial Hospital in Astoria. TAC ¶ 18. He provides care at both of these hospitals as well as at Crosian Ridge Surgery Center and at Aspen Spine, which is adjacent to Meridian Park. TAC ¶ 18. Dr. Roberts is the first African-American neurological surgeon to practice at Meridian Park. TAC ¶ 13.

Meridian Park is an Oregon non-profit corporation that operates a hospital in Tualatin, Oregon. TAC ¶ 3. Dr. Cramer has clinical privileges at Meridian Park, is the chair of Meridian Park's Surgery Department Executive Committee, and serves on Meridian Park's Medical Executive Committee. TAC ¶ 8. Dr. Soldevilla also has clinical privileges at Meridian Park and serves on its Surgery Department Executive Committee. TAC ¶ 4. Dr. Soldevilla is a member of Northwest Neurosurgical, which is based in Tualatin. TAC ¶ 5. Dr. Tatsumi also has clinical privileges at Meridian Park and serves on its Surgery Department Executive Committee.

TAC ¶ 6. Dr. Keenen, too, has clinical privileges at Meridian Park. TAC ¶ 7. Both Dr. Tatsumi and Dr. Keenen are members of Pacific Spine, which is based in Tualatin. TAC ¶ 8.

At all material times, Dr. Soldevilla, Dr. Tatsumi, and Dr. Keenen were the only spine surgeons with clinical privileges at Meridian Park, other than Dr. Roberts. TAC ¶ 15. Dr. Soldevilla, Dr. Tatsumi, and Dr. Keenen all directly compete with Dr. Roberts. TAC ¶ 28. In addition, Dr. Cramer is part-owner of South Portland Surgical Center, where Dr. Tatsumi and Dr. Keenen often perform medical procedures. TAC ¶ 28.

Before coming to Portland, Dr. Roberts asked Dr. Soldevilla and Dr. Keenan if they would be willing to provide back-up coverage for Dr. Roberts if he were to begin practicing at Meridian Park. TAC ¶ 16. Although both refused, Dr. Roberts was able to obtain coverage from a surgeon at another hospital in North Portland. TAC ¶ 16. Dr. Roberts alleges that during their initial conversation, Dr. Soldevilla falsely informed Dr. Roberts that there was no demand for neurological surgeons at Meridian Park. TAC ¶ 17. Shortly after his return to Portland, Dr. Roberts met Dr. Keenen in person. Dr. Roberts alleges that Dr. Keenen refused to shake hands with Dr. Roberts and that Dr. Keenen turned, walked away, and muttered a highly-charged racial epithet. TAC ¶ 19.

By July 2011, just four months after arriving back in Portland, Dr. Roberts' practice was thriving. He alleges that he had "rocketed to the top of the number of spine procedures being performed" at Meridian Park and was its "most popular neurological surgeon." TAC ¶ 22. According to Dr. Roberts, Dr. Soldevilla, Dr. Tatsumi, and Dr. Keenen "all became openly hostile toward Dr. Roberts as he became more successful." TAC ¶ 22. Dr. Roberts alleges that Dr. Soldevilla, Dr. Tatsumi, and Dr. Keenen "made false and derogatory statements regarding

Dr. Roberts' skill and competence as a surgeon" to patients, referring physicians, and hospital staff. TAC ¶ 23.

In October 2011, Meridian Park initiated a "peer review," under the supervision of Meridian Park's Medical Executive Committee, of Dr. Robert's care of a specific surgical patient. TAC ¶ 26. As a member of the Medical Executive Committee and chair of the Surgery Department at Meridian Park, Dr. Cramer has responsibility over determinations to initiate peer review of surgeons at the hospital. TAC ¶ 27. In addition, because Dr. Soldevilla and Dr. Tatsumi are members of the Surgery Department's Executive Committee, they also have responsibilities relating to peer review. TAC ¶ 28. Meridian Park used an "external physician" to review Dr. Roberts' care of the patient who was the subject of the peer review. TAC ¶ 29. Dr. Roberts alleges that Meridian Park and Dr. Cramer gave the external reviewer "incomplete records." TAC ¶ 29.[1]

In November 2011, Meridian Park issued a "precautionary" suspension of Dr. Roberts' clinical privileges to perform lumbar surgeries, which accounted for approximately 70 percent of Plaintiffs' revenues. TAC ¶¶ 30-31. This required Plaintiffs to cancel six pending surgeries. TAC ¶ 34. During the precautionary suspension period, Meridian Park appointed an ad hoc investigating committee to review Dr. Roberts' clinical privileges. TAC ¶ 35. At the recommendation of the ad hoc committee, Meridian Park lifted the precautionary suspension, but continued to imposed restrictions on Dr. Roberts' ability to perform lumbar procedures, including a requirement that Dr. Roberts have a "proctor" for his next five lumbar surgeries.

---

[1] Dr. Roberts also alleges that Meridian Park did not inform him about the peer review while it was taking place. TAC ¶ 29. This allegation appears to be inconsistent with Dr. Roberts' allegation that he "was informed" in October 2011 that "his care of a surgical patient was being submitted to a 'peer review' process at Meridian Park." TAC ¶ 26. Even if these two allegations are inconsistent, this does not affect the analyses of the pending motions to dismiss, and any potential inconsistency here will be ignored at this stage of the litigation.

TAC ¶ 36. During the next six months, Meridian Park failed to accept Dr. Roberts' proposed "proctoring arrangement," thereby precluding Dr. Roberts from performing lumbar surgeries during that period.  TAC ¶ 40. Although Meridian Park eventually approved a proctor, Dr. Roberts' clinical privileges "remained restricted." TAC ¶ 41.

Dr. Roberts alleges that Meridian Park's "peer review process was affected by systematic racial bias." TAC ¶ 41. According to Dr. Roberts, he "was subjected to a peer review process, month-long suspension, and year-long restrictions and proctoring requirement" based on his race.  TAC ¶ 42. In addition, Dr. Roberts alleges that confidential patient medical records concerning two of his patients were improperly disclosed by Meridian Park to Dr. Soldevilla and Dr. Tatsumi. TAC ¶¶ 44-45.

Dr. Roberts also asserts that Defendants "encouraged, instigated or allowed" a complaint to be made about Dr. Roberts in which the complainant alleged that Dr. Roberts engaged in misconduct during a surgery conducted in March 2013. TAC ¶ 53. The complaint was made by a radiology technician "sitting some distance from the operating table," and "[n]one of the three people at the operating table corroborated the accusation."  TAC ¶ 54. While this complaint was being investigated, Dr. Roberts' clinical privileges were placed on "active provisional" status. TAC ¶ 57. In April 2013, the investigation exonerated Dr. Roberts, and Meridian Park "renewed" his privileges and removed the "provisional" label from his active privileges.

## DISCUSSION

## A.  DEFENDANTS' MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

### 1.  Standards

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs.,*

*Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the Court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Baca*, 652 F.3d at 1216. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

### 2.  Overview of Plaintiffs' Claims and Defendants' Motions to Dismiss

In Plaintiffs' Third Amended Complaint, Plaintiffs allege the following claims for relief: (1) Intentional Interference with Economic Relations; (2) Breach of Contract; (3) Breach of the Duty of Good Faith and Fair Dealing; (4) Race Discrimination; (5) Aiding and Abetting Discrimination; (6) Intentional Infliction of Severe Emotional Distress; (7) Unlawful Retaliation; (8) Unlawful and Unfair Business Practices; (9) Unlawful Conspiracy in Restraint of Trade;

(10) Attempted Monopolization; (11) Civil Conspiracy; (12) Conspiracy to Discriminate; and (13) Neglect to Prevent Discrimination.

Defendants' motions to dismiss challenge the legal sufficiency of seven of Plaintiffs' claims: Claims 4, 5, 7, 8, 9, 10, and 12. Meridian Park's motion to dismiss (Dkt. 33) challenges Plaintiffs' Claims 7, 8, and 9. Dr. Cramer's motion to dismiss (Dkt. 38) challenges Plaintiffs' Claims 4, 5, 7, 8, 9, and 12. Pacific Spine's motion to dismiss (Dkt. 47) challenges Plaintiffs' Claims 4, 5, 7, 8, 9, and 10. Each of Plaintiffs' challenged claims are discussed below. In addition, the Court, *sua sponte*, also discusses Plaintiffs' Claim 11.

### a.  Plaintiffs' Fourth and Fifth Claims (Race Discrimination)

As a preliminary matter, Defendants assert that Plaintiffs' Fourth and Fifth Claims should be plead as a single claim under Or. Rev. Stat. § 659A.885(7), which creates a civil cause of action for violations of Or. Rev. Stat. § 659A.403 and Or. Rev. Stat. § 659A.406. Specifically, Or. Rev. Stat. § 659A.885(7) provides a cause of action for:

> Any individual against whom any distinction, discrimination, or restriction on account of race . . . has been made by any place of public accommodation . . . against the operator or manager of [a] place [of public accommodation], [an] employee or person acting on behalf of the place or [an] aider or abettor of the place or person.

The Court agrees that Plaintiffs' racial discrimination and aiding and abetting claims are not correctly brought as separate claims. Plaintiffs may replead their Fourth and Fifth Claims as a single claim under Or. Rev. Stat. § 659A.885(7).

### i.  Pacific Spine's Motion to Dismiss Plaintiffs' Fourth and Fifth Claims

Pacific Spine moves to dismiss Plaintiffs' Fourth and Fifth Claims for failure to state a claim. Pacific Spine argues that neither Pacific Spine nor Meridian Park is a place of "public accommodation" with respect to Dr. Roberts under Oregon's public accommodations statute.

PAGE 8 – OPINION AND ORDER

Plaintiffs respond that hospitals are places of public accommodation under Oregon law and that although Dr. Roberts is not a consumer of hospital services, Oregon discrimination law protects "all people within the jurisdiction of this state." *See* Or. Rev. Stat. § 659A.403(1).

Or. Rev. Stat. § 659A.403(1) provides:

> All persons within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of any places of public accommodation, without any distinction, discrimination or restriction on account of race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older.

A place of public accommodation means "any place or service offering to the public accommodations, advantages, facilities or privileges whether in the nature of goods, services, lodgings, amusements, transportation or otherwise." Or. Rev. Stat. § 659A.400(1)(a). Exempted from the definition of "public accommodation" is any "institution, bona fide club or place of accommodation that is in its nature distinctly private." Or. Rev. Stat. § 659A.400(2)(e).

Meridian Park provides medical services to the public and is therefore a public accommodation within the definition stated in Or. Rev. Stat. 659A.400(a)(1). Pacific Spine does not contest that a hospital is a place of public accommodation, but instead argues that Dr. Roberts is not a "consumer" of the services that a hospital offers to the general public. Clinical privileges to practice neurosurgery, Pacific Spine argues, are offered only to a very narrow class of persons and, therefore, are "distinctly private."

Looking to the plain text of the statute, Oregon's public accommodation laws do not protect only the general public or "consumers." The words used in Or. Rev. Stat. § 659A.403 provide broad protection from discrimination by places of public accommodation to "all persons within the jurisdiction of the state." *See* Or. Rev. Stat. § 659A.403(1). Nowhere within § 659A.403 is there a requirement that the discrimination by the public accommodation be

regarding a service offered to the general public. Instead, the statute states that all persons are "entitled to full and equal accommodations, advantages, facilities and privileges" of any place of public accommodation. *Id.* Therefore, the fact that neurosurgery privileges are not offered to the general public as a whole, but only to licensed physicians, does remove Dr. Roberts from the protection of the Oregon's public accommodation laws.

Although the term "customer" does appear in a later subsection of Or. Rev. Stat. § 659A, the definition of "all persons" as used in § 659A.403(1) is not so restricted. Or. Rev. Stat. § 659A.411(1) defines "customer" as "an individual who is lawfully on the premises of a place of public accommodation." This definition, however, is explicitly limited to sections § 659A.411 through § 659A.415, which all deal with a customer's use of an employee-only restroom. *See* Or. Rev. Stat. § 659A.411. The word "customer" does not appear anywhere in the general public accommodation discrimination prohibition set forth in § 659A.403.[2]

Ninth Circuit case law interpreting the substantially similar federal public accommodations law, Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, supports this interpretation. The "general rule," as stated in 42 U.S.C. § 12182(a), provides:

---

[2] Pacific Spine cites three Oregon cases, arguing that these cases support the proposition that only "consumers" of public services are protected by Or. Rev. Stat. §659A.403. Although these cases support the notion that a public accommodation provides services to the public, none of these cases provide any support for Pacific Spine's assertion the Oregon public accommodation laws treat "consumers" and "non-consumers" differently. *See Schwenk v. Boy Scouts of America*, 551 P.2d 465, 469 (Or. 1976) (holding that the legislature did not intend the Boy Scouts to be a place of public accommodation under Oregon law); *Lahmann v. Grand Aerie of Fraternal Order of Eagles*, 121 P.3d 671, 676 (Or. Ct. App. 2005) (holding there is a two part inquiry for determining if an entity is a public accommodation: first, whether the organization provides goods and services to the public; and second, whether the organization is "distinctly private"); *Graham v. Kold Kist Beverage Ice., Inc.*, 607 P.2d 759, 762 (Or. Ct. App. 1979) (finding that a wholesale ice machine company was not a place of public accommodation because it did not offer its services to the public, but only to a small group of retail stores).

> No individual shall be discriminated against on the basis of
> disability in the full and equal enjoyment of the goods, services,
> facilities, privileges, advantages, or accommodations of any place
> of public accommodation by any person who owns, leases (or
> leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). Subparagraphs § 12182(b)(i)-(iii) then add several specific prohibitions

that protect "an individual or class of individuals," and subparagraph § 12182(b)(iv) defines that

phrase, for purposes of clauses (i)-(iii) only, as "the clients or customers of the covered public

accommodation that enters into the contractual, licensing or other arrangement." 42 U.S.C.

§ 12182(b)(1)(A)(iv).

    In *Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (2007), the Ninth Circuit rejected the

argument that the "general rule" of the disability public accommodation statute, 42 U.S.C.

§ 12182(a), should be limited by this narrow definition of "an individual or class of individuals."

The court held that "clause (iv) of subparagraph (b)(1)(A) is not literally applicable to Title III's

general rule prohibiting discrimination against disabled individuals." *Molski*, 481 F.3d at 733

(quoting *PGA Tour v. Martin*, 532 U.S. 661, 679 (2001). It is not just "clients or customers" that

are protected by the federal public accommodations law because "Title III's broad general rule

contains no express 'clients or customers' limitation." *Id.* The Ninth Circuit's holding that "one

need not be a client or customer of a public accommodation to feel the sting of its

discrimination" and to be protected by Title III supports a similar and consistent interpretation of

Oregon's public accommodation statute, concluding that Oregon's law also protects more than

just consumers of public services. *Id.* at 733. This is especially so because Oregon's public

accommodation statute, like the general rule under the federal ADA, contains no "client or

customer" limiting provision. *See* Or. Rev. Stat. § 659A.400, *et seq*.[3]

---

[3] Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, also prohibits discrimination
on the basis of race in places of public accommodation. Oregon's statutory definition of "public

Also of note in the *Molski* opinion is the court's reliance on the Third Circuit decision in *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 122 (3d Cir. 1998). *Molski*, 481 F.3d at 733. In *Menkowitz*, the Third Circuit applied the federal public accommodation disability antidiscrimination laws to a physician working as an independent contractor at a hospital who had lost his privileges because of alleged discrimination. The Third Circuit, consistent with the Ninth Circuit, held that both the text and legislative history of Title III "clearly demonstrate that the phrase 'clients or customers,' which only appears in 42 U.S.C. § 12182(b)(1)(A)(iv), is not a general circumscription of Title III and cannot serve to limit the broad rule announced in 42 U.S.C. § 12182(a)." *Menkowitz*, 154 F.3d at 121.

At oral argument, Pacific Spine argued that the definition of "public accommodation" in Title III of the ADA was significantly broader than in the Oregon public accommodation statute and, therefore, the Court should not look to Ninth Circuit precedent under the ADA in determining how to interpret Or. Rev. Stat. § 659.403. Pacific Spine asserted that Title III (the ADA statute) applied to "private" organizations and that the Oregon statute does not.

Pacific Spine's interpretation of Title III and the Oregon statute is not persuasive. Section 12181(7) of the ADA defines "public accommodation" by listing numerous "private entities" that are to be considered as public accommodations. In this context, "private entities," is defined in § 12181(6) as "any entity other than a public entity (as defined in section 12131(1) of this title)." 42 U.S.C. § 12181(6). A "public entity" is defined as "(A) any state or local

---

accommodation" is more similar to the definition in Title III of the ADA than to the definition in Title II of the Civil Rights Act. Oregon's statute and Title III of the ADA both provide a broad definition of "public accommodation," whereas Title II of the Civil Rights Act limits public accommodations to "lodgings; facilities principally engaged in selling food for consumption on the premises; gasoline stations; places of exhibition or entertainment; other covered establishments." 42 U.S.C. § 2000a(b). Therefore, Title III of the ADA provides a more useful comparison with the Oregon statute at issue in this case.

government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority." 42 U.S.C. § 12131(1). Thus, Title III essentially defines a private entity as a non-government entity. Moreover, Or. Rev. Stat. § 659A.403, like Title III, exempts governmental entities from the protections of the public accommodation statute. *See* Or. Rev. Stat. § 659A.400(2). Therefore, the Court is not persuaded that Title III of the ADA is materially distinguishable and, therefore is persuaded by the Ninth Circuit's holding in *Molski*. 481 F.3d at 733.[4]

Both the text of Or. Rev. Stat. § 659A.403 and the Ninth Circuit case law interpreting federal public accommodation disability discrimination law support the interpretation that Oregon's public accommodation laws protect more than just "consumers." In the Third Amended Complaint, Plaintiffs allege that Dr. Roberts is a physician with privileges at Meridian Park, Meridian Park is a place of public accommodation, and that the Defendants deprived Dr. Roberts of the opportunity fully to use the privileges provided by Meridian Park based on Dr. Roberts' race. These allegations are sufficient to state a claim under Or. Rev. Stat. § 659A.403. Thus, Pacific Spine's motions to dismiss Plaintiffs' Fourth and Fifth Claims are denied.[5]

---

[4] Pacific Spine also cites two unpublished district court cases that interpret local public accommodation statutes in Wisconsin and the District of Columbia. *See Samuels v. Rayford*, CIV 91-0365, 1995 WL 376939 (D.D.C. Apr. 10, 1995); *Hetz v. Aurora Med. Ctr. Of Manitowoc Cnty.*, 06-C-636, 2007 WL 1753428 (E.D. Wic. June 18, 2007). In *Hetz*, the district court based its opinion on "longstanding Wisconsin common law"—unparalleled in Oregon—that established that if an opportunity is limited to a select group of individuals then it is likely not a public accommodation. *Hetz*, 2007 WL 1753428, *17. And the District of Columbia statute interpreted in *Samuels* is not similar to the Oregon statute. *See* D.C. Code §§ 2-1401.02, 2-2501. Therefore, the Court does not find these unpublished cases persuasive.

[5] Although the text of § 659A.403 provides that protection against discrimination by public accommodations applies to more than just consumers, the specific statutory protection

ii. **Dr. Cramer's Motion to Dismiss Plaintiffs' Fourth and Fifth Claims**

Dr. Cramer also moves to dismiss Plaintiffs' Fourth and Fifth Claims, arguing that Plaintiffs have not alleged sufficient facts to support either individual or aider and abettor liability on the part of Dr. Cramer. In order to state a claim against Dr. Cramer, he argues, Plaintiffs must make "some allegation from which one could infer that the defendant intended to support race-based discrimination or acted with racial bias." Dkt. 39 at 4. Plaintiffs respond that their allegations that Dr. Cramer participated in a process that was racially discriminatory and that he inappropriately initiated the peer review process are sufficient to state a claim.[6] Citing *Allen v. U.S. Bancorp*, 264 F. Supp 2d 945, 954 (D. Or. 2003), Plaintiffs argue that they do not need to allege racial animus as long as they allege racially discriminatory treatment. Dkt. 52 at 4.

Although Oregon courts have not articulated what elements a plaintiff must plead to state a claim under Or. Rev. Stat. § 659A.885(7), the text of the statute provides guidance. Subsection (7) creates a cause of action for any individual whom "any distinction, discrimination or restriction on account of race" has been made by: (1) "a place of public accommodation;" (2) "any employee or person acting on behalf of the place of accommodation;" or (3) "any person aiding or abetting the place or person in violation of [Or. Rev. Stat. §] 659A.406." Or. Rev. Stat.

---

does not apply to "employees" of public accommodations. Other sections of Chapter 659A specifically prohibit discrimination against employees of public accommodations by employers. *See* Or. Rev. Stat. § 659A.030. These employment discrimination provisions are sometimes limited in scope in that they may not apply to employers with fewer than 25 employees. *See, e.g.*, Or. Rev. Stat. § 659A.090(2)(a). If §659A.403, which has no such limitation, applied to employees of public accommodations regardless of the number of employees, it would make such limitations superfluous in some instances. Therefore, although § 659A.403 applies more broadly than to just consumers, it does not apply to employees, which are comprehensively addressed in other provisions. This issue does not affect the pending case, however, because Dr. Roberts is not an employee of Meridian Park.

[6] Plaintiffs also argue that this motion is related to Plaintiffs' Eleventh Claim, alleging civil conspiracy. Plaintiffs' Eleventh Claim is discussed below.

PAGE 14 – OPINION AND ORDER

§ 659A.885(7). Therefore, because Dr. Cramer is not a place of public accommodation and is not an employee of Meridian Park, Plaintiffs must allege either that Dr. Cramer was acting on behalf of Meridian Park or that Dr. Cramer aided or abetted Meridian Park in discriminating against Dr. Roberts.

In their Third Amended Complaint, Plaintiffs do not allege that Dr. Cramer acted on behalf of Meridian Park. Plaintiffs do, however, allege that Dr. Cramer aided and abetted Meridian Park by initiating and participating in a racially inappropriate peer review process. In paragraph 27 of the Third Amended Complaint, Plaintiffs allege that Dr. Cramer "has responsibility over determinations to initiate peer review." In the same paragraph, Plaintiffs allege that Dr. Robert's patient outcomes did not meet Meridian Park's standard for a peer review, but Dr. Cramer still urged Meridian Park to initiate a peer review process. TAC ¶ 27. And in paragraph 42, Plaintiffs allege that the "peer review process was affected by systematic racial bias" and that "Dr. Roberts was treated differently than other similarly situated physicians practicing at Meridian Park" because of his race. TAC ¶ 42.

Although Plaintiffs did not allege that Dr. Cramer had racial animus, Plaintiffs have alleged that Dr. Cramer initiated and presided over a peer review process that treated Dr. Roberts differently than other physicians because of Dr. Roberts' race. Because no specific mental state is expressly required under the statute, Plaintiffs' allegations are sufficient to state a claim against Dr. Cramer under Or. Rev. Stat. § 659A.885(7). Therefore, Dr. Cramer's motions against Plaintiffs' Fourth and Fifth Claims are denied with respect to Dr. Roberts.

### iii.  Aspen Spine's Claims

Defendants Meridian Park and Dr. Cramer also argue that Aspen Spine is not a proper plaintiff with respect to the discrimination claims (Plaintiffs Fourth, Fifth, and Twelfth Claims). The Court agrees that Aspen Spine, as a corporation, has no race and thus cannot be

discriminated against on account of its race. Therefore, Plaintiffs' Fourth, Fifth, and Twelfth

Claims are dismissed with respect to Plaintiff Aspen Spine.

### b. Plaintiffs' Seventh Claim (Unlawful Retaliation)

Meridian Park argues that Plaintiffs fail to state a claim for unlawful retaliation because

Or. Rev. Stat. § 659A.030 protects against any unlawful *employment* practices and Dr. Roberts is

not an employee of Meridian Park.[7] Plaintiffs respond that Or. Rev. Stat. § 659A.030 protects

"any person" from retaliation for a protected activity, not just employees from unlawful

employment practices. In light of the statutory text and context of Or. Rev. Stat. § 659A.030,

Plaintiffs' argument is unpersuasive.

Or. Rev. Stat. § 659A.030(1)(f) states:

> (1) It is an unlawful employment practice:
>
>> (f) For any person to discharge, expel or otherwise discriminate
>> against any other person because that person has opposed any
>> unlawful practice, or because that other person has filed a
>> complaint, testified or assisted in any proceeding under this
>> chapter or has attempted to do so.

Or. Rev. Stat. § 659A.030(1)(f). Subsection (1) of § 659A.030 prohibits "unlawful employment

practice[s]," and subparagraph (f) falls within subsection (1).  Plaintiffs' argument that

§ 659A.030(1)(f) applies outside the employment context ignores the text of subsection (1). To

interpret § 659A.030(1)(f) to apply outside the employment context would be effectively to

---

[7] The Court notes that Aspen Spine is not a proper plaintiff under Plaintiffs' Seventh
Claim for relief. As a corporation, Aspen Spine is not an employee and thus cannot be
unlawfully retaliated against by its employer. Moreover, Plaintiffs allege no facts to suggest that
Aspen Spine participated in a protected activity.

PAGE 16 – OPINION AND ORDER

delete the words "employment practice" from § 659A.030(1). Therefore, the plain text of the statute demonstrates that § 659A.030 requires an employment relationship.[8]

Additionally, Oregon courts have consistently interpreted Or. Rev. Stat. § 659A.030 to apply only in the employment context. *See, e.g.*, *Portland State Univ. Chapter of Am Ass'n of Univ. Professors v. Portland State Univ.*, 291 P.3d 658, 710 (Or. 2012) (holding that § 659A.030(1)(f) "prohibits an employer from treating a protected class—e.g., employees who have participated in a protected activity—differently"); *Boynton-Burns v. Univ. of Or.*, 105 P.3d 893, 897 (Or. Ct. App. 2005) (holding that a prima facie case of retaliation requires "an employment action disadvantaging the plaintiff") (emphasis added). Plaintiffs cite no Oregon case, and the Court is not aware of any case, where § 659A.030 has been applied outside the employment context or absent an employer-employee relationship.

For these reasons, Meridian Park's motion to dismiss Plaintiffs' Seventh Claim is granted.

### c.  Plaintiffs' Eighth Claim (UTPA)

Plaintiffs' Eighth Claim alleges that all Defendants violated Oregon's Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. § 646.605, *et seq.*, by disparaging Plaintiffs' "surgical abilities and services" through false or misleading representations of fact. TAC ¶ 108. Plaintiffs cite Or. Rev. Stat.  § 646.608, subsection (h) of which provides that it is an unlawful practice when a person "[d]isparages the . . . services . . . of . . . another by false or misleading representations of fact." The UTPA creates a private cause of action for "a person that suffers an ascertainable loss of money or property, real or personal, as a result of another person's willful

---

[8] Plaintiffs argue that the fact that the statute references "labor unions" and "employment agencies" demonstrates that the protections apply to more than just employees. All of these entities, however, are within the employment context. To interpret § 659A.030(1)(f) to apply to "any person" would take the statute entirely outside the employment context.

use or employment of a method, act or practice declared unlawful by ORS 646.608." Or. Rev. Stat. § 646.638(1).

Meridian Park, Dr. Cramer, and Pacific Spine move to dismiss Plaintiffs' Eighth Claim, arguing that Plaintiff is not a "consumer" of products or services from any Defendant and that "only a consumer has standing to bring a claim under the UTPA." Dkt. 34 at 7; Dkt. 39 at 6; Dkt. 47 at 2. The moving parties rely on *CollegeNET, Inc. v. Embark.com, Inc.*, 230 F. Supp. 2d 1167 (D. Or. 2001), and *Oregon Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170 (D. Or. 1998), *aff'd*, 185 F.3d 957 (9th Cir. 1999). Plaintiffs respond that any "person" may bring a claim under the UTPA, that "person" is broadly defined under the statute as meaning "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity" (Or. Rev. Stat. § 646.605(4)), and that under Defendants' interpretation of the UTPA, "the main victim of falsely disparaging statements – the competitor being disparaged – would be left without a remedy." Dkt. 52 at 13.

The specific question presented here is whether a private cause of action under the UTPA is limited to a person (broadly defined and including non-natural entities) alleging that he, she, or it is a consumer of products or services provided by the defendant in violation of the statute. This question is quite familiar to the federal courts in this district and has been consistently ruled upon in the affirmative since at least 1998. Further, there is no state appellate opinion to the contrary, and all of the state cases cited by Plaintiffs are distinguishable. In addition, notwithstanding the consistent interpretation of the UTPA on this point given by the federal courts in this district, the Oregon Legislature has not amended the statute to change this result. Finally, Plaintiffs err when they assert that under Defendants' interpretation "the main victim of falsely disparaging

statements—the competitor being disparaged—would be left without a remedy." Such a victim

would have a remedy under the common law tort of defamation.

In *Oregon Laborers-Employers*, U.S. District Judge Marsh wrote in 1998 that "Oregon's

UTPA is a consumer protection statute." 17 F. Supp. 2d at 1179. He concluded that "Plaintiffs

have not alleged that they are consumers of defendants' products and thus, I find that they lack

standing to maintain claims under the Oregon UTPA." 17 F. Supp. 2d at 1179. Judge Marsh also

distinguished one of the state cases that Dr. Roberts and Aspen Spine heavily rely upon,

*Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto, Inc.*, 879 P.2d 193 (Or. Ct. App. 1994),

*aff'd in part, rev'd in part*, 932 P.2d 1141 (Or. 1997). As Judge Marsh explained:

> *Goodyear* involved an action by a franchisee against a franchisor
> and the issue was whether a corporation could ever maintain an
> action under the Act. The court held that the franchisee was a
> "person" under the Act and could maintain a claim. However, the
> franchisee was a consumer of the franchisor's products and
> services. Thus, my ruling is not based upon the fact that plaintiffs
> are entities rather than individuals, but is instead based upon the
> fact that plaintiffs have not alleged that they are in any manner
> "consumers" of defendants' products.

17 F. Supp. 2d at 1180 n.9.

Less than three years later, the same question again came before the federal court in this

district. U.S. Magistrate Judge Stewart extensively reviewed both the state cases and the

legislative history underlying the UTPA. Expressly agreeing with Judge Marsh, Judge Stewart

wrote that "this court has little difficulty in concluding that the UTPA provides a cause of action

only for consumers;" Judge Stewart's Findings and Recommendation were adopted in their

entirety by U.S. District Judge Jones. *CollegeNET, Inc. v. Embark.com, Inc.*, 230 F. Supp. 2d

1167, 1169, 1174 (D. Or. 2001). Judge Stewart noted that "[n]either the parties nor the court

have been able to find any Oregon cases addressing whether the UTPA protects only

consumers." *CollegeNET*, 230 F. Supp. 2d at 1172. She then closely examined the statutory text

PAGE 19 – OPINION AND ORDER

and context of Or. Rev. Stat. § 646.638 and determined that the use of the word "person" in this

statute is ambiguous because it "could reasonably be interpreted to include only those persons

who have purchased or contracted for goods or services." *Id.* at 1173. Judge Stewart then

carefully examined the legislative history of the UTPA before reaching her conclusion. *Id.*

at 1173-74.

　　Other judges in this district have since reached the same result. In *L & A Designs v.*

*Xtreme ATVS, Inc.*, 2012 WL 1532417, Case No. 3:10-cv-627-HZ (D. Or. April 30, 2012), U.S.

District Judge Hernandez addressed the defendants' argument that the plaintiffs lack standing to

sue under the UTPA because they are not "consumers" of the defendants' products:

> In this District, several courts have also ruled that the UTPA is
> limited to consumer actions. *Oregon Laborers-Emp'r Health &*
> *Welfare Trust Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170,
> 1180 (D. Or. 1998) ("Plaintiffs have not alleged that they are
> consumers of defendants' products and thus, I find that they lack
> standing to maintain claims under the Oregon UTPA."), *aff'd,* 185
> F.3d 957 (9th Cir. 1999); *CollegeNet, Inc. v. Embark.com, Inc.*,
> 230 F. Supp. 2d 1167, 1175 (D. Or. 2001); *Volm v. Legacy Health*
> *Sys.*, 237 F. Supp. 2d 1166, 1175 (D. Or. 2002) (summary
> judgment granted because plaintiff was not a consumer of
> defendant's products); *Allegro Corp. v. Only New Age Music, Inc.*,
> No. 01-790-HU, 2002 U.S. Dist. LEXIS 27449, 2003 WL
> 23571745 (D. Or. 2003); *Lanphere Enters. v. Jiffy Lube Int'l*, No.
> 01-1168-BR, 2003 U.S. Dist. LEXIS 16205 (D. Or. July 9, 2003).

*L & A Designs*, 2012 WL 1532417 at *3-4. Judge Hernandez then concluded:

> I am not persuaded by Plaintiffs' arguments and see no reason to
> depart from the well-reasoned opinions of my colleagues. In
> particular, Magistrate Judge Stewart delved carefully into the
> legislative history of the UTPA and concluded that the UTPA is
> limited to consumer actions. *CollegeNet*, 230 F. Supp. 2d at 1174.

*Id.* at *4. Most recently, U.S. Magistrate Judge Coffin considered this issue and reached the same

result in his Findings and Recommendation. *Slep-Tone Entm't Corp. v. Shenanigans Lounge*,

2013 WL 1768444, at *4, Case No. 6:12-cv-1236-TC (D. Or. Feb. 22, 2013) ("Plaintiff has not

PAGE 20 – OPINION AND ORDER

alleged that it is a consumer of defendants' products and thus, I find that plaintiff lacks standing to maintain claims under the UTPA.") On April 20, 2013, U.S. District Judge Aiken considered the plaintiff's objections to Judge Coffin's Findings and Recommendation concerning the UTPA claim and adopted those Findings and Recommendation. *Slep-Tone Entm't Corp.*, Case No. 6:12-cv-1236-TC, Dkt. 91 (D. Or. Apr. 20, 2013).

This Court agrees. Because Plaintiffs do not allege that they were consumers of any Defendants products or services, Plaintiffs fail to state a claim under the UTPA. Defendants' motion to dismiss Plaintiffs' Eighth Claim is granted, and that claim is dismissed.

### d.  Plaintiffs' Ninth Claim (Antirust – Conspiracy in Restraint of Trade)

Plaintiffs' Ninth Claim alleges, against all Defendants, an unlawful conspiracy in restraint of trade in violation of both state law, Or. Rev. Stat. § 646.725, and federal law, 15 U.S.C. § 1 (Sherman Act, Section 1). Plaintiffs assert that Defendants conspired "to restrain plaintiffs from practicing their trade at Meridian Park Hospital." TAC ¶ 113. Plaintiffs further allege that "Defendants' anti-competitive actions have injured competition because they have reduced the quality of neurological surgery services available in the market including Meridian Park. Defendants' unlawful practices have further injured competition by threatening to drive plaintiffs from the market." TAC ¶ 114.

Both Meridian Park and Dr. Cramer move to dismiss Plaintiffs' Ninth Claim, arguing that "Plaintiffs fail to allege any cognizable harm to competition." Dkt. 34 at 9; Dkt. 39 at 6. Movants argue that neither of the purported harms to competition alleged by Plaintiffs at TAC ¶ 114 is sufficient to state a claim. *Id.*

The movants are correct in part and incorrect in part. Merely "threatening" to drive a participant from the market is insufficient to show an injury to competition. Although Section 2 of the Sherman Act prohibits both actual monopolization and attempted monopolization, neither

Section 1 of the Sherman Act nor its state equivalent prohibits an unsuccessful attempt to conspire to restrain trade. *See generally United States v. American Airlines, Inc.*, 743 F.2d 1114, 1122 (5th Cir. 1984).

Plaintiffs, however, also allege that Defendants' conspiracy "reduced the quality of neurological surgery services available in the market." TAC ¶ 114. The moving Defendants do not cite any case law for the proposition that reducing the quality of a product or service available in a relevant market is not an antitrust injury. Indeed, a reduction in quality may constitute antitrust injury, at least when allocative efficiency has been adversely affected. *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("an act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality") (emphasis in original). In support of their motions, the moving Defendants cite two decisions arising in the context of summary judgment, a fact that makes both cases distinguishable and inapplicable.

Meridian Park first cites *Volm v. Legacy Health System, Inc.*, 237 F. Supp. 2d 1166 (D. Or. 2002). In that case, a lactation consultant sued the Legacy Health System after the defendant banned the plaintiff from treating patients at any of its facilities, including Meridian Park. In granting the defendant's motion for summary judgment against the plaintiff's state and federal antitrust claims, the district court noted that the plaintiff did not allege that defendants committed a per se violation of Section 1 of the Sherman Act, did not provide a market analysis, and appeared to restrict the relevant market to either Meridian Park or to all hospitals in the Legacy System. *Volm*, 237 F. Supp. 2d at 1174. The Court stated that such a restricted view of the relevant market is not realistic in light of the fact that there were other hospitals in the Portland area in which a mother can give birth and at which the plaintiff could have practiced. *Id.* Thus,

the court concluded that the plaintiff had not raised a factual issue that she suffered an "antitrust injury." *Id.*

Meridian Park also cites *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404 (9th Cir. 1991). In that case, a nurse anesthetist brought an antitrust action against a hospital after the hospital decided to use only physicians to provide anesthesia services. The district court entered summary judgment in favor of the hospital.  The Ninth Circuit affirmed, holding that the hospital's practice was not a group boycott that was illegal per se and that the plaintiff failed to meet his burden of showing that the hospital's policy substantially restrained competition in a relevant market, which is required under a rule of reason analysis. *Bhan*, 929 F.2d at 1412-13. In rejecting the plaintiff's argument that his proof of actual anti-competitive effects rendered a formal market analysis unnecessary, the Ninth Circuit held that the "only actual effect shown is that one nurse anesthetist no longer works at one hospital. This alone is not enough to demonstrate actual detrimental effects on competition." *Bhan*, 929 F.2d at 1414.

Both *Volm* and *Bhan* were decided at summary judgment, which serves to test the factual sufficiency of a plaintiff's evidence. *See Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial"). Similarly, in this case, the Court will wait until summary judgment or trial to assess the factual sufficiency of plaintiff's evidence of the alleged adverse effect on competition.

Finally, Meridian Park also argues that Plaintiffs do not allege that Dr. Roberts is no longer able to perform spine and neurological surgical procedures at Meridian Park or that there are any current restrictions on Dr. Roberts' privileges. In short, Meridian Park argues, "[a]ny patient who presently wishes to use Dr. Roberts' services at Meridian Park Hospital may do so."

Dkt. 34 at 9. In response, Plaintiffs assert that the "injury sustained as a result of the suspension and restriction of Dr. Roberts' privileges continues in plaintiffs' claims for damages and is cognizable injury under the antitrust laws." Dkt. 52 at 15. Plaintiffs are correct. *See Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1275 (D.C. Cir. 1991) ("the alleged injuries will survive, in the form of appellant's claims for damages, regardless of whether appellant is or is not ultimately restored to full membership and privileges").

For all of these reasons, Defendants' motion to dismiss Plaintiffs' Ninth Claim is denied.

### e.  Plaintiffs' Tenth Claim (Antitrust – Attempted Monopolization)

Plaintiffs' Tenth Claim alleges, against all Defendants except Meridian Park and Dr. Cramer, attempted monopolization in violation of both state law, Or. Rev. Stat. § 646.730, and federal law, 15 U.S.C. § 2 (Sherman Act, Section 2). Plaintiffs allege a relevant market consisting of spine and neurological surgery within the area served by Meridian Park. TAC ¶ 117. Plaintiffs further allege that "full privileges at Meridian Park Hospital are necessary to compete effectively," that "there is a dangerous probability that these defendants' attacks on plaintiffs' business will enable defendants to achieve monopoly power in the market for neurological services in the area served by Meridian Park Hospital," and that the alleged anticompetitive actions "were taken with the specific intent to monopolize the relevant market." TAC ¶¶ 117-119.

Pacific Spine moves to dismiss Plaintiffs' Tenth Claim, arguing that "Plaintiffs plead no facts that could lead to the plausible conclusion that defendants have a possibility (much less a dangerous probability) of controlling a market share sufficient to constitute monopoly power." Dkt. 48 at 13. Pacific Spine asserts that Plaintiffs only allege a campaign against a single person, Dr. Roberts, and that even if Meridian Park were the only hospital in this geographic region capable of offering clinical privileges of neurological surgeons, "plaintiffs' claim fails because

PAGE 24 – OPINION AND ORDER

the exclusion of one person from a market cannot plausibly lead to the conclusion that defendants have a dangerous probability of achieving monopoly power." *Id.*

Pacific Spine's argument ignores Plaintiffs' allegation that Defendants Dr. Soldevilla, Dr. Tatsumi, and Dr. Keenen "were the only spine surgeons other than Dr. Roberts with clinical privileges at Meridian Park." TAC ¶ 15. Thus, if Plaintiff's market definition is correct (and Pacific Spine, in its motion to dismiss, does not challenge the sufficiency of Plaintiffs' allegation of that market definition), then any exclusion of Dr. Roberts from the market would leave Defendants Dr. Soldevilla, Dr. Tatsumi, and Dr. Keenen collectively holding a one hundred percent market share. At the pleading stage, this is sufficient. *See Rebel Oil*, 51 F.3d at 1437 ("The aggregation of market shares of several rivals is justified if the rivals are alleged to conspire to monopolize"); *cf. United States v. American Airlines, Inc.*, 743 F.2d at 1122. Plaintiffs' Third Amended Complaint, taken as a whole, can be construed as alleging a conspiracy to monopolize, although Plaintiffs may clarify this point in a later pleading, if that is Plaintiffs' intended allegation.

For all of these reasons, Defendants' motion to dismiss Plaintiffs' Tenth Claim is denied.

### f.  Plaintiffs' Eleventh Claim (Civil Conspiracy)

Plaintiffs' Eleventh Claim alleges a civil conspiracy among all Defendants. Plaintiffs allege that all Defendants "reached a meeting of the minds, in or after June 2011, that they should pursue the goals of damaging plaintiffs' business, damaging Dr. Roberts' reputation, and causing economic and non-economic harm to plaintiffs." TAC ¶ 123. Plaintiffs further allege that Defendants "engaged in unlawful acts as alleged above," TAC ¶ 124, and "[a]ccordingly, all defendants are jointly and severally liable for all tortious actions taken in furtherance of the conspiracy's goals." TAC ¶ 125. Although no Defendant has moved against Plaintiffs' Eleventh Claim, the Court, *sua sponte*, dismisses this claim as a separate tort.

PAGE 25 – OPINION AND ORDER

The Oregon Supreme Court has expressly held:

> neither "conspiracy" nor "aid and assist" is a separate theory of recovery. *See Bonds v. Landers*, 279 Or. 169, 175 (1977) (so explaining with respect to "conspiracy"); *Bliss v. Southern Pacific Co.*, 212 Or. 634, 642 (1958) (same). Rather, conspiracy to commit or aiding and assisting in the commission of a tort are two of several ways in which a person may become jointly liable for another's tortious conduct.

*Granewich v. Harding*, 329 P.2d 788, 792 (Or. 1999). On several occasions since then, the Oregon Court of Appeals has unequivocally stated "civil conspiracy is not, itself, a separate tort for which damages may be recovered." *See, e.g., Morasch v. Hood*, 222 P.3d 1125, 1131 (Or. Ct. App. 2009).

For these reasons, Plaintiffs' Eleventh Claim is not properly stated and is dismissed as a separate tort. If Plaintiffs believe that they need to add any further allegations to their other claims in order to hold any particular Defendant jointly liable with another for any properly plead separate tort, Plaintiffs have leave to replead.

**g.  Plaintiffs' Twelfth Claim (Conspiracy to Discriminate)**

Dr. Cramer moves to dismiss the Plaintiffs' Twelfth Claim against Dr. Cramer for failure to state a claim, arguing that Plaintiffs did not allege facts sufficient to show that Dr. Cramer conspired to discriminate against Dr. Roberts. To state a claim for conspiracy to discriminate under 42 U.S.C. § 1985(3), a plaintiff is required to allege four elements:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Carpenters v. Scott*, 463 U.S. 825, 828-29 (1983). In order to satisfy the first element, a plaintiff must show the existence of a conspiracy, or that the defendants made an agreement to deprive or

attempt to deprive the plaintiff of a protected right. *See Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998); *see also Winstead v. D.C.*, 840 F. Supp. 2d 149, 161 (D.D.C. 2012). "A mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988). An express agreement need not be proven—the "conspiracy can be inferred from conduct." *Scott*, 140 F.3d at 1284; *see also United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir. 1987). A plaintiff must also show that the conspiracy was "motivated by a purpose (malevolent or benign) directed specifically at" a protected class. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993).

Plaintiffs respond that because "some defendants urged that Dr. Roberts be reviewed or suspended" and "other defendants, including Cramer and the hospital, agreed, and reviewed and suspended Dr. Roberts," an agreement can be inferred. Dkt. 52 at 6. Moreover, in paragraph 123 of the Third Amended Complaint, Plaintiffs allege that "Defendants reached a meeting of the minds, in or after June 2011, that they should pursue the goals of damaging plaintiffs' business, damaging Dr. Roberts' reputation, and causing economic and non-economic harm to plaintiffs." TAC ¶ 123. In paragraph 64, Plaintiffs assert, "Defendants' actions were undertaken by improper motive in that they were motivated by racial prejudice." TAC ¶ 64. Taken together, these allegations, in the context of the other facts alleged in the complaint, are sufficient to survive a motion to dismiss. Dr. Cramer's motion is denied.

## B.  DR. TATSUMI'S MOTION TO STRIKE INITIAL DISCLOSURES OR TO COMPEL

Early in this case, the parties agreed to exchange the initial disclosures required under Fed. R. Civ. P. 26(a)(1)(A), rather than to submit a stipulated motion to the Court for relief from that rule. The parties then exchanged their initial disclosures. One of the required subjects of initial disclosure is a list of the names and, if known, contact information "of each individual likely to have discoverable information—along with the subjects of that information—that the

PAGE 27 – OPINION AND ORDER

disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(i). As part of Plaintiffs' initial disclosures, Plaintiffs identified approximately 63 named individuals as persons "likely to have discoverable information" supporting Plaintiffs' claims. Plaintiffs state that approximately 28 of these named individuals are parties or employees of parties to this case and the balance "largely consist of physicians who refer patients to neurosurgeons in Dr. Roberts' market and patients treated by both Dr. Roberts and Dr. Tatsumi." Dkt. 75 at 2. Dr. Tatsumi, however, states that "Defendant has communicated with some of those disclosed witnesses, only to find that a number of them do not, in fact, possess such information." Dkt. 54 at 3. Dr. Tatsumi argues that Plaintiffs have not complied with their obligations under the initial disclosure rule and seeks an order either striking Plaintiffs' initial disclosures and requiring Plaintiffs to submit new disclosures or directing Plaintiffs to amend their initial disclosures. Dkt. 53.

Plaintiffs' initial disclosures were signed by Plaintiffs' counsel. Under Rule 26(g)(1)(A) of the Federal Rules of Civil Procedure, counsel's signature certifies that to the best of the signer's knowledge, information, and belief formed after a reasonable inquiry, "the disclosure is complete and correct as of the time it is made." In addition, under Rule 11(b)(1), an attorney's signature on a paper certifies that, among other things, the document "is not being presented for any improper purpose, such as to . . . needlessly increase the cost of litigation." The Court presumes that all counsel take seriously their obligations, signatures, and statements under the Federal Rules of Civil Procedure. Dr. Tatsumi's statement that "Defendant has communicated with some of those disclosed witnesses, only to find that a number of them do not, in fact, possess such information" is insufficient to rebut this presumption.

PAGE 28 – OPINION AND ORDER

In addition, Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule 26(a) or Rule 26(e) (which concerns supplemental disclosures) may not use or call that witness to supply evidence on a motion, at a hearing, or at a trial, "unless the failure was substantially justified or is harmless." This sanction creates an incentive to be over-inclusive, rather than under-inclusive.

Further, the Court has examined Dr. Tatsumi's initial disclosure statement. In addition to identifying by name and position approximately one dozen individuals likely to have discoverable information, Dr. Tatsumi added, among others:

- "All physicians who served on neurosurgery peer review committees at or for Meridian Park Hospital from 2010 to the present."

- "All personnel at Meridian Park Hospital involved in issuing and/or reviewing staff privileges for Dr. Roberts."

- "Unknown persons at, or formerly at, the Colorado Medical Board. Contact information unknown."

- "Unknown persons at, or formerly at, Avista Adventist Hospital in Colorado. Contact information unknown."

- "Unknown persons at, or formerly at, OHSU involved in the training of Dr. Roberts."

Dkt. 76-1 at 4 through 5. It is likely that at least some of these people who are described by Dr. Tatsumi by category or description and not by name will not, in fact, possess material information.

The Rule 26(a) initial disclosures, when not waived by the parties with permission of the court, are only a starting point for the formal discovery process. Interrogatories, document requests, requests for admission, and depositions (including deposition notices or subpoenas directed to an organization under Rule 30(b)(6)) are all available to a party to assist in efficiently and cost-effectively identifying relevant information that may be useful to the resolution of a

lawsuit, by trial or otherwise. If any discovery becomes (or is threatening to become) unreasonably burdensome or expensive, the court is available to set appropriate limits. *See, e.g.,* Fed. R. Civ. P. 26(b)(2)(C) (allowing a court to set appropriate discovery limits under the rule of proportionality).

Considering the number of claims, the number of parties, and the complexity of issues raised in the Third Amended Complaint, Plaintiffs' initial disclosures are not unreasonable. Dr. Tatsumi's motion to strike Plaintiffs' initial disclosures or to compel amended disclosures is denied.

## C.  PLAINTIFFS' MOTION TO DISQUALIFY COUNSEL FOR DR. KEENEN

### 1.  Background

Defendant Dr. Keenen is represented in this lawsuit by attorneys Karen O'Kasey and Calliste J. Korach from the law firm of Hart Wagner, LLP. That law firm and two of its other attorneys, Mark H. Wagner and Michael Wiswall, previously represented Dr. Roberts, along with other defendants, in two lawsuits in which Dr. Roberts and the other defendants were sued for alleged medical malpractice. Based on the earlier representation of Dr. Roberts in the two medical malpractice lawsuits, which have long since ended, Dr. Roberts moves to disqualify the law firm of Hart Wagner, LLP and its attorneys from representing Dr. Keenen in the pending action adverse to Dr. Roberts. Dkt. 41.

### 2.  Standards

The decision to grant a motion for disqualification of counsel is within the sound discretion of the district court. *Gas-A-Tron of Arizona v. Union Oil Co.*, 534 F.2d 1322, 1325 (9th Cir. 1976). In exercising that discretion, the district court faces several competing tensions. On the one hand, the Ninth Circuit has counseled:

> It must be remembered that the attorney in such situations as this
> does not have the shelter enjoyed by a defendant whose adversary
> must meet a burden of proof. Where conflict of interest or abuse of
> professional confidence is asserted, the right of an attorney freely
> to practice his profession must, in the public interest, give way in
> cases of doubt.

*Chugach Elec. Ass'n v. U.S. Dist. Ct.*, 370 F.2d 441, 444 (9th Cir. 1966) (granting writ of

mandamus directing the disqualification of attorney who previously represented opposing party

in another matter, where there was a likelihood that private matters learned during the prior

representation could be used in a manner adverse to the former client). On the other hand, a

motion to disqualify counsel is subject to "particularly strict judicial scrutiny" because of the

potential for "misuse of [state ethical] rules for tactical purposes." *Optyl Eyewear Fashion Int'l.*

*Corp. v. Style Cos., Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985), *quoting Rice v. Baron*, 456 F.

Supp. 1361, 1370 (S.D.N.Y. 1978); *see also Zeggert v. Summit Stainless Steel, LLC*, 2013 WL

3216112, Case No. 3:13-cv-16-PK (D. Or. June 24, 2013). The Court is mindful of both of these

competing principles in resolving the pending motion.

In determining a matter of attorney disqualification, the federal courts apply the law of

the forum state. *See, e.g., In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000)

(citations omitted); *Zeggert*, at *1. In support of Dr. Roberts' motion to disqualify current

counsel for Dr. Keenen, Dr. Roberts relies on Rules 1.9(a) and 1.10(a) of the Oregon Rules of

Professional Conduct ("ORPC"). ORPC 1.10(a) provides for firm-wide imputation of conflicts

of interest, subject to an exception not relevant here. In relevant part, ORPC 1.10(a) states:

"While lawyers are associated in a firm, none of them shall knowingly represent a client when

any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9." Thus,

the relevant inquiry is whether ORPC 1.9(a) would preclude either Mark Wagner or Michael

Wiswall from representing Dr. Keenen in this matter adverse to Dr. Roberts.[9] If so, then no one from the Hart Wagner law firm may represent Dr. Keenen in this matter.

ORPC 1.9(a) provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless each affected client gives informed consent, confirmed in writing.

ORPC 1.9(a). No one disputes that Dr. Keenen's interest in the pending lawsuit is materially adverse to Dr. Roberts' interest. Similarly, no one disputes that Dr. Roberts has not given his informed consent, confirmed in writing, to attorneys from the Hart Wagner law firm representing Dr. Keenen in this matter. Further, no one disputes that the pending action is not the same matter as either of the two previous lawsuits in which Mr. Wagner and Mr. Wiswall represented Dr. Roberts. Thus, the sole question is whether either of the two earlier cases are "substantially related" to the pending lawsuit.

ORPC 1.9(d) defines the term "substantially related" in this context. It provides:

> For purposes of this rule, matters are "substantially related" if (1) the lawyer's representation of the current client will injure or damage the former client in connection with the same transaction or legal dispute in which the lawyer previously represented the former client; or (2) there is a substantial risk that confidential factual information as would normally have been obtained in the prior representation of the former client would materially advance the current client's position in the subsequent matter.

ORPC 1.9(d). No one disputes that Hart Wagner's representation of Dr. Keenen in the pending action will not injure or damage Dr. Roberts in connection with either of the two previous lawsuits in which that law firm represented him. Those two matters have been resolved and are

---

[9] ORPC 1.7 concerns duties owed to current clients. Because Dr. Roberts is not a current client of the Hart Wagner law firm, it has no application to the pending motion.

closed, and Dr. Roberts faces no continuing risk from either matter. Thus, the only remaining inquiry is whether "there is a substantial risk that confidential factual information as would normally have been obtained in the [two] prior representation[s]" of Dr. Roberts "would materially advance" Dr. Keenen's position in the pending matter. This inquiry calls for a close evaluation of the prior representation, especially in light of the significant potential for misuse of state ethical rules for improper tactical purposes.

### 3.    The Two Prior Cases

From 2000 to 2007, Dr. Roberts was a medical resident at Oregon Health Sciences University ("OHSU"). Dkt. 42 at 6 of 15. He was an "assisting surgeon" in two surgeries during his residency at OHSU that became the subject of two lawsuits alleging medical negligence. *Id.*

### a.    *Spear v. OHSU, et al.*

In November 2003, Charlotte and Stuart Spear sued OHSU and Doctors Johnny Delashaw, Michael Sandquist, Matthew Hunt, and Warren Roberts for medical negligence arising out of a surgery performed on Charlotte Spear in October 2001. *Spear, et al. v. OHSU, et al.*, Case No. 0310-11318 (Mutnomah County Circuit Court). Dkt. 43-1 (complaint).  The plaintiffs in that case alleged that Dr. Delashaw was the "attending surgeon" and that Doctors Sandquist, Hunt, and Roberts were "assisting surgeons." *Id*. at ¶ 9. Mark Wagner and, later, Michael Wiswall, both of Hart Wagner, LLP (then known as "Hoffman, Hart & Wagner"), represented all of the defendants in this case.

In *Spear*, the plaintiff served a discovery request on all defendants seeking documents from each defendant relating to, among other things, any peer review investigation relating to Ms. Spear and any lawsuits in which any defendant has been a party. Dkt. 43-4. In March 2004, Hart Wagner filed an answer on behalf of all defendants, including Dr. Roberts, denying any

fault or negligence on the part of any defendant. Dkt. 43-5. The case was dismissed by stipulation in March 2009. Dkt. 43-6.

In addition to these facts provided by Dr. Roberts in support of his motion to disqualify counsel, Dr. Keenen submitted additional facts through the Declarations of Mark Wagner and Michael J. Wiswall, Dkts. 58 and 59, respectively. According to Mr. Wagner's declaration:

> In August 2004, *Spear v. OHSU* was placed into abatement.
>
> *Spear v. OHSU* involved a complication that occurred during surgery. All of the persons identified in the operative report were named as defendants, including Dr. Warren Roberts, who was a junior resident at the time. The target of the case, and the only defendant with whom I would have had any direct contact, was Dr. Delashaw. To the best of my knowledge and belief, I never met or talked with Dr. Roberts, nor did I obtain any confidential information from or about him. It was customary in OHSU litigation for plaintiff's counsel to name numerous individuals whose names appeared on the surgical record. Residents like Dr. Roberts were almost never the focal point of the case.
>
> Given the allegations in the case, the presence of the attending neurosurgeon as a defendant and Dr. Roberts' role as a resident, *Spear v. OHSU* was not the type of case in which I would have obtained confidential factual information about Dr. Roberts.
>
> In June 2007, I retired and the defense of *Spear v. OHSU* was transferred to Michael J. Wiswall.

Dkt. 58 at ¶¶ 2-5. Mr. Wiswall picks up the story in his declaration:

> The case was originally filed by attorney Linda Rudnick and defended by my partner Mark Wagner. The case was placed into abatement in August 2004. Although it remained inactive, the defense of the case was transferred to me when Mark Wagner retired in June 2007. A few months earlier, attorney Stephen Hendricks was substituted as attorney for the plaintiff.
>
> As best as I recall, Mr. Hendricks did not engage in any formal discovery. The case remained in abatement. He asked whether there was interest in settlement, and being told there was none, plaintiff voluntarily dismissed the case. The Stipulated General Judgment of Dismissal was signed by Judge Jerry Hodson on March 2, 2009.

PAGE 34 – OPINION AND ORDER

> The *Spear* case involved a complication that occurred during surgery. All of the physicians identified in the operative report were named as defendants, including Dr. Warren Roberts, who was a junior resident at the time. Although Dr. Roberts was named as a defendant, the allegations related to decisions and care by the attending neurosurgeon (Dr. Delashaw), not by Dr. Roberts. Because Dr. Roberts was a junior resident, and did not make any of the decisions at issue, *Spear v. OHSU* was not the type of case in which I would have obtained confidential factual information about Dr. Roberts.
>
> I did not obtain any confidential factual information concerning Dr. Roberts during the course of representing the defendants in *Spear v. OHSU*.
>
> At the time I took over the defense of the case, I believe Dr. Roberts was living outside of Oregon. I never met him in person. I spoke with him on the phone once or twice. Again, although he was named as a defendant, as a resident his care was not truly at issue given his very limited role. Dr. Roberts was never deposed.

Dkt. 59 at ¶¶ 2-6.

After the oral argument, Dr. Roberts submitted a declaration *in camera* describing the interactions that he had with the Hart Wagner firm during the course of the *Spear* lawsuit. The Court has reviewed this declaration closely and considered its contents.

The Court finds that there is not a substantial risk that confidential factual information as would normally have been obtained in the prior representation of Dr. Roberts in *Spear v. OHSU, et al.* would materially advance Dr. Keenen's position in the pending matter. Accordingly, that matter is not "substantially related" to the pending lawsuit for purposes for requiring disqualification under ORPC 1.9(a).

### b.    *Burgos v. OHSU*

On November 28, 2006, Jose David Burgos, acting *pro se*, sued OHSU and Doctors Alexander West and Warren Roberts for medical negligence arising out of a surgery performed on Mr. Burgos in December 3, 2004. *Burgos v. OHSU, et al.*, Case No. 0611-12348 (Multnomah

PAGE 35 – OPINION AND ORDER

County Circuit Court). Dkt. 43-2 (complaint). The plaintiff alleged that "Defendant West was the attending surgeon and defendant Roberts assisted West." *Id.* at ¶ 5. Mr. Wiswall and Jason Gardner of the Hart Wagner firm represented all of the defendants in the *Burgos* case.

In March 2007, Mr. Wiswall and Mr. Gardner filed a motion to dismiss on behalf of all defendants, arguing that the plaintiff failed to serve the defendants within the applicable two-year statute of limitations and that there was no applicable tolling period allowed for suits against public bodies. Dkt. 43-7. The defense counsel in that case added that even if a 60-day tolling period were allowed in this case, the plaintiff still failed to serve the individual defendants, Dr. West and Dr. Roberts, within the additional 60-day period. *Id.* The trial court granted the defendants' motion to dismiss and entered a General Judgment of Dismissal in favor of all defendants on June 14, 2007. Dkt. 43-8.

In addition to these facts provided by Dr. Roberts in support of his motion to disqualify counsel, Dr. Keenen submitted additional facts through the Declaration of Michael J. Wiswall, Dkt. 59. According to Mr. Wiswall's declaration:

> The medical care at issue occurred December 3, 2004 and the lawsuit was filed November 28, 2006. The *pro se* plaintiff did not complete service on the defendants until January 29, 2007.
>
> Our office filed various motions including a motion to dismiss based on the statute of limitations on March 5, 2007. Mr. Burgos did not file a response to the motion nor did he appear at the hearing. Judge Cheryl Albrecht granted the motion to dismiss on April 13, 2007.
>
> From the beginning, we identified the *Burgos* case as one that was likely barred by the statute of limitations based on the plaintiff's failure to serve the defendants within 60 days of filing. Consequently, we did not engage in discovery, nor did the plaintiff.
>
> Burgos is not the type of case in which confidential factual information about Dr. Roberts would normally have been obtained in the course of my representation of the defendants, particularly

PAGE 36 – OPINION AND ORDER

since it was a case that we immediately identified as one that was likely barred by the statute of limitations. Our efforts were focused on achieving an early dismissal, which was accomplished. There was no discovery between the parties and the plaintiff never served a request for production.

Further, as in *Spear*, Dr. Roberts was a resident and the decision making and care was directed by the attending neurosurgeon, who was also named as a defendant (Dr. Alexander West), and not by Dr. Roberts.

I did not obtain any confidential factual information concerning Dr. Roberts during the course of my representation of the defendants in *Burgos v. OHSU*.

Dkt. 59 at ¶¶ 8-13.

In the context of this background and considering Dr. Roberts' *in camera* submission, the Court finds that there is not a substantial risk that confidential factual information as would normally have been obtained in the prior representation of Dr. Roberts in *Burgos v. OHSU, et al.* would materially advance Dr. Keenen's position in the pending matter. Accordingly, that matter is not "substantially related" to the pending lawsuit for purposes for requiring disqualification under ORPC 1.9(a).

### 4. *Jackson v. Soldevilla*

In addition to Plaintiffs' argument that Hart Wagner's prior representation of Dr. Roberts in the *Spear* and *Burgos* cases requires disqualification under ORPC 1.9(a), Plaintiffs initially argued that after the complaint was filed in the pending lawsuit, Mark Wagner and Jennifer Pruzzlino, both from the Hart Wagner law firm, acted adversely to Dr. Roberts in the case of *Jackson v. Soldevilla*, Case No. C127101CV (Washington County Circuit Court). In that case, the plaintiff Elizabeth Jackson sued Dr. Soldevilla (a defendant in the pending lawsuit) for medical malpractice. Dr. Roberts was a "subsequent treating physician" for Ms. Jackson. Mr.

Wagner and Ms. Pruzzlino of Hart Wagner represented Defendant Soldevilla in the *Jackson* lawsuit.

During the course of their representation of Dr. Soldevilla as a defendant in the *Jackson* case, Mr. Wagner took the deposition of Dr. Roberts. According to Dr. Roberts, Mr. Wagner "questioned Dr. Roberts closely about Dr. Roberts' compliance with standards of care in the neurological surgery field" and "read questions from the complaint in this case." Dkt. 42 at 8 of 15; *see also* Dkt. 43-10 (partial transcript from deposition of Dr. Roberts); Dkt. 72-1 (same).

In Dr. Roberts' motion to disqualify the Hart Wagner law firm, Dr. Roberts' asks for an order of disqualification and, initially, "an order that any deposition testimony of Dr. Roberts obtained by Hart Wagner is precluded from use in this action." Dkt. 41 at 2. At oral argument. Dr. Roberts withdrew his request for an order preventing the use of Dr. Roberts' deposition testimony. Therefore, the Court does not address that issue. For all of the reasons previously stated, Dr. Roberts' motion to disqualify Hart Wagner, LLP as counsel for Defendant Dr. Keenen (Dkt. 41) is denied.

## CONCLUSION

Meridian Park's, Dr. Cramer's, and Pacific Spine's motions to dismiss, Dkts. 33, 38, and 47, are GRANTED IN PART AND DENIED IN PART, as follows: Plaintiff Aspen Spine's claims are dismissed from Claims 4, 5, and 12; Plaintiffs' Claims 7, 8, and 11 are dismissed; and Plaintiff Dr. Roberts' Claim 12 is dismissed with leave to replead. Dr. Tatsumi's motion to strike Plaintiffs' initial disclosures or to compel the filing of additional disclosures, Dkt. 53, is DENIED. Plaintiffs' motion to disqualify counsel for Dr. Keenen, Dkt. 41, is DENIED.

**IT IS SO ORDERED**.

DATED this 24th day of January, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge