IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| WARREN G. ROBERTS, M.D., F.A.A.N.S., an individual, and ASPEN SPINE AND NEUROSURGERY CENTER, P.C., an Oregon professional corporation, | Case No. 3:13-cv-01136-SI |
| Plaintiffs, | |
| v. | OPINION AND ORDER |
| LEGACY MERIDIAN PARK HOSPITAL, INC., an Oregon non-profit corporation, d/b/a/ LEGACY MERIDIAN PARK MEDICAL CENTER, an Oregon assumed business name; FRANCISCO X. SOLDEVILLA, M.D., an individual; NORTHWEST NEUROSURGICAL ASSOCIATES, LLC, an Oregon limited liability corporation, ROBERT L. TATSUMI, M.D., an individual; TIMOTHY L. KEENEN, M.D., an individual; PACIFIC SPINE SPECIALISTS, LLC, an Oregon limited liability corporation; and ANDREW B. CRAMER, M.D., an individual, | |
| Defendants. | |

PAGE 1 – OPINION AND ORDER

Micah D. Fargey, FARGEY LAW PC, 5 Centerpointe Drive, Fourth Floor, Lake Oswego, OR 97035. Of Attorneys for Plaintiffs.

Keith S. Dubanevich and Keil M. Mueller, STOLL STOLL BERNE LOKTING & SHLACHTER, P.C., 209 S.W. Oak Street, Suite 500, Portland, OR 97204. Of Attorneys for Defendants Legacy Meridian Park Hospital, Inc. and Andrew B. Cramer, M.D.

Robert D. Scholz and Megan L. Farris, MACMILLAN SCHOLZ & MARKS, P.C., 900 S.W. Fifth Avenue, Suite 1800, Portland, OR 97204. Of Attorneys for Defendants Northwest Neurosurgical Associates, LLC and Francisco X. Soldevilla, M.D.

Elizabeth E. Lampson and Christopher M. Parker, DAVIS ROTHWELL EARLE & XOCHIHUA, P.C., 111 S.W. Fifth Avenue, Suite 2700, Portland, OR 97204. Of Attorneys for Defendant Pacific Spine Specialists, LLC.

Karen M. O'Kasey and Calliste J. Korach, HART WAGNER, LLP, 1000 S.W. Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Timothy L. Keenen, M.D.

Jeffrey W. Hansen, Stephen R. Rasmussen, and Joseph A. Rohner, IV, SMITH FREED & EBERHARD, P.C., 111 S.W. Fifth Avenue, Suite 4300, Portland, OR 97204, and James L. Dumas and Michael J. Estok, LINDSAY HART, LLP, 1300 S.W. Fifth Avenue, Suite 3400, Portland, OR 97201. Of Attorneys for Defendant Robert L. Tatsumi, M.D.

**Michael H. Simon, District Judge.**

Defendants state that this lawsuit has been settled by agreement reached with Plaintiffs' then-counsel acting within the scope of his authority. Plaintiffs disagree. After filing a motion to enforce the alleged settlement and receiving a declaration in response from the lead Plaintiff denying that his then-counsel had authority to settle, Defendants filed a Joint Motion to Declare Partial Waiver of Attorney-Client Privilege. Dkt. 137. For the following reasons and subject to the contingencies and limitations described below, this motion is granted in part.

## BACKGROUND

Plaintiff, Warren G. Roberts, M.D., is a neurological surgeon and the owner of Plaintiff Aspen Spine and Neurosurgery Center, P.C. In Plaintiffs' Fourth Amended Complaint, Plaintiffs allege claims of tortious interference with economic relations, breach of contract, intentional infliction of emotional distress, racial discrimination in violation of state and federal law, and

PAGE 2 – OPINION AND ORDER

conspiracy to restrain trade and attempted monopolization in violation of state and federal antitrust laws.

According to Defendants, on October 17, 2014, Plaintiffs, through Plaintiffs' then-counsel Mark McDougal, offered to settle this lawsuit by dismissing all claims against Defendant Timothy L. Keenen, M.D. in exchange for a waiver of any fees and costs. Defendants further contend that on October 20, 2014, Defendant Keenen, through counsel, accepted Plaintiffs' offer. Defendants also contend that between October 17, 2014, and October 20, 2014, similar settlement offers were extended by Plaintiffs' then-counsel to all Defendants, the only material terms of which were the exchange of mutual releases of all claims, counterclaims, and demands for fees and costs. Defendants add that they all accepted the terms of Plaintiffs' settlement offer, with the sole exception of Defendant Francisco X. Soldevilla, M.D., who requested, as an additional settlement term, that he receive a letter signed by Dr. Roberts or his counsel confirming that no money was paid or other consideration was given by Dr. Soldevilla in exchange for the mutual releases. According to Defendants, Plaintiffs' then-counsel stated that he had no objection to writing such a letter for Dr. Soldevilla.

Defendants further state that on October 29, 2014, they sent a draft stipulation of dismissal to Plaintiffs' then-counsel Mr. McDougal. According to Defendants, Mr. McDougal reported that he approved the form of the stipulation but added that he was scheduled to meet with his client Dr. Roberts on November 14, 2014, and that Defendants' counsel were not yet authorized to file the stipulation of dismissal until after Mr. McDougal met with Dr. Roberts. Defendants further assert that on November 17, Mr. McDougal told Defendants' counsel that he soon either would authorize Defendants to file the stipulation or would move to withdraw as Plaintiffs' counsel.

On November 17, 2014, Mr. McDougal and his law firm, Kafoury & McDougal, moved

to withdraw as Plaintiffs' counsel and for a stay of discovery. In his supporting declaration,

Mr. McDougal states:

> 1.  The firm of Kafoury & McDougal agreed to represent
> Dr. Roberts on a contingent fee basis in the above-entitled
> litigation. The law firm of Kafoury & McDougal has expended
> considerable hours in representing Dr. Roberts and Aspen Spine
> and Neurosurgery Center, PC.
>
> 2.  Irreconcilable differences have arisen between Dr. Roberts and
> the law firm of Kafoury & McDougal.
>
> 3.  Kafoury & McDougal has been advancing costs in this matter.
> Unless withdrawal is granted, Kafoury & McDougal would be
> required to continue to advance costs and hundreds of hours of
> contingent attorney time. It is anticipated that numerous experts
> would be required, and that there will be numerous depositions. All
> of these costs and attorney time would have to be borne by
> Kafoury & McDougal pending the outcome of this case, pursuant
> to the terms of their standard contingency fee agreement.
>
> 4.  Recent events involving the parties and negotiation of potential
> resolution of this case have created these irreconcilable
> differences.
>
> 5.  Plaintiffs have been advised of plaintiffs' counsel's instant
> motion to withdraw from this case.
>
> 6.  On October 17, the plaintiffs made a settlement offer. All
> defendants have responded. Plaintiffs and plaintiffs' counsel have
> irreconcilable differences with regard to the path of this litigation.
>
> 7.  Depositions in this case have not yet begun. Depositions were
> currently scheduled to start on Wednesday, November 19.
>
> 8.  Because of the settlement posture, Dr. Roberts has not been
> prepared for his deposition. The current irreconcilable differences
> between Dr. Roberts and his counsel would make deposition
> preparation (even assuming there was adequate time) extremely
> difficult.
>
> 9.  The final facts and circumstances giving rise to this motion to
> withdraw occurred on Friday, November 14, in the afternoon. This
> motion is being drafted and filed on Monday morning,
> November 17.

Dkt. 119. On November 18, 2014, the Court granted the motion to withdraw and to stay

discovery, as filed by Plaintiffs' then-counsel.

On December 15, 2014, Defendants filed a Joint Motion to Enforce Settlement

Agreement. Dkt. 123. Plaintiffs requested additional time to retain new counsel and respond to

Defendants' motion, which was allowed. On January 12, 2015, Plaintiffs' new counsel,

Mr. Fargey, entered his appearance for Plaintiffs and filed Plaintiffs' opposition to Defendants'

Joint Motion to Enforce Settlement Agreement.

In support of Plaintiffs' opposition to Defendants' Joint Motion to Enforce Settlement

Agreement, Plaintiffs submitted the Declaration of Dr. Roberts. In his declaration, Dr. Roberts

states:

> 1. I am one of the plaintiffs in this matter and owner of the other
> plaintiff, Aspen Spine and Neurosurgery Center, P.C. ("Aspen
> Spine"). I make this declaration in opposition to Defendants' "Joint
> Motion to Enforce Settlement Agreement." I have personal
> knowledge of the facts set forth below and, if called to testify,
> could and would testify competently to these facts.
>
> 2. I never offered to settle this lawsuit or accepted any settlement
> proffered by any of the defendants. I do not know why the
> defendants either believe or purport to believe this case is or was
> ever settled. It is not.
>
> 3. Dr. George Brown is, I understand, the CEO of Legacy Health
> System and a fellow African-American medical doctor. Dr. Brown
> and I are peers. I have had a number of conversations with him
> about the subject matter of this lawsuit and the challenges to my
> practice I believe were caused by the defendants' wrongful actions.
>
> 4. Right around October 17, 2014, I had a brief conversation with
> Dr. Brown by telephone. I told him that I was considering
> dropping this lawsuit. I am not sure why exactly I said this, but I
> recall being drained by this lawsuit, my relationship with my
> former counsel, and the toll of the defendants' wrongful actions.
>
> 5. Dr. Brown is not a party to this case and I did not believe that
> the substance of our conversation would be relayed to anyone. I

PAGE 5 – OPINION AND ORDER

did not ask him to tell anyone, let alone one or all of the defendants.

6.  I only told Dr. Brown that I was thinking about dropping the lawsuit (or considering it, I'm not sure) – but definitely not that I wanted to, offered to, or would settle, drop, or walk away from this lawsuit. I would never have made such an offer to the defendants.[1]

7.  Additionally, I certainly did not state that Aspen Spine would settle or that I would attempt to settle on its behalf.

8.  Mark McDougal, my attorney, then learned that I had spoken to Dr. Brown. I did not in any way say or indicate that he should then attempt to offer or effectuate any settlement.

9.  I later discovered that Mr. McDougal, without my consent or knowledge, told all of the defendants that I offered to settle the case for nothing more than the defendants' agreement to drop their counterclaims, which I understand are only for attorney fees. I do not understand why he did this; I did not ask or authorize him to do so.

10.  When Mr. McDougal told me of this, I was shocked. I never offered or intended, explicitly, implicitly, actually, or apparently, any settlement of this case to the defendants.

11.  The defendants' actions have caused my practice to lose millions of dollars in economic damages, and I experienced significant non-economic damages from their actions. I would never agree or offer to settle this case for a walkaway.

12.  I understand the defendants are concerned that depositions were postponed because of their supposed belief that the case would be or was settled. If this is a concern, I will agree to grant additional time to finish discovery in this case.

Dkt. 135.

---

[1] Dr. Roberts is responding to a declaration submitted by counsel for Defendant Legacy Meridian Park Hospital, Inc. ("Legacy"), in which Legacy's counsel states that he spoke with Legacy's General Counsel, who reported hearing from Legacy's Chief Executive Officer, Dr. George Brown, that Dr. Roberts had "told Dr. Brown that he had decided to drop his case." *See* Dkt. 125 at ¶ 5. These statements contain hearsay within hearsay but provide useful context for understanding Dr. Roberts's declaration. In resolving the pending motions, the Court has not considered any inadmissible hearsay for the truth of any matter asserted. *See* Fed. R. Evid. 805.

After receiving Dr. Roberts's declaration, Defendants filed their Joint Motion to Declare

Partial Waiver of Attorney-Client Privilege. Dkt. 137. According to Defendants, Plaintiffs' new

counsel informed Defendants that Plaintiffs continue to assert the attorney-client privilege on all

of their communications with Mr. McDougal. Thus, according to Defendants, this precludes

Defendants' efforts to obtain testimony from Mr. McDougal. Dkt. 138. As explained by

Defendants' counsel:

> If defendants are successful in obtaining the Order requested in
> their Joint Motion to Declare Waiver of Attorney-Client Privilege,
> defendants intend to obtain testimony from Mr. McDougal on this
> subject, either through a declaration or, if necessary, by compelling
> Mr. McDougal's testimony through a subpoena for deposition
> testimony as well as a subpoena *duces tecum* for production of any
> written communications between Mr. McDougal (and his agents)
> and plaintiffs relating to Mr. McDougal's authority to settle,
> dismiss, or otherwise resolve the plaintiffs' claims.

*Id*. at ¶ 3. Plaintiffs oppose Defendants' Joint Motion to Declare Partial Waiver of Attorney-

Client Privilege. That motion has been fully briefed and is now before the Court. In addition, the

Court has granted Defendants' request that this motion be resolved before Defendants are

required to file their reply in support of their previously-filed Joint Motion to Enforce Settlement

Agreement.

## DISCUSSION

In Defendants' Joint Motion to Declare Partial Waiver of Attorney-Client Privilege,

Defendants seek a declaration that Plaintiffs "have waived their attorney-client privilege relating

to all communications—written and oral—with their previous attorney, Mark McDougal, on the

subject of [Mr.] McDougal's authority to settle, dismiss, or otherwise resolve the claims in this

case." Dkt. 137, at 2. Defendants argue that such a ruling is necessary for Defendants to obtain

testimony from Mr. McDougal "to directly rebut the testimony from plaintiff Roberts in

opposition to [Defendants' Joint Motion to Enforce Settlement Agreement] in which he chose to

PAGE 7 – OPINION AND ORDER

voluntarily offer the alleged substance of his communications with McDougal to advance the

plaintiffs' position that this case is not settled." *Id*.

Defendants offer three arguments in support of their motion. Defendants argue that "at

least some of the communications between plaintiff Roberts and McDougal were never

'privileged' in the first place, as they were intended to be passed along to third parties, namely

defense counsel." *Id*. at 5. Defendants also argue that Plaintiffs have expressly waived the

attorney-client privilege on this subject because Dr. Roberts has "voluntarily disclosed some of

his communications with McDougal." *Id*. Defendants further argue that Plaintiffs have impliedly

waived the privilege because Plaintiffs have placed otherwise privileged communications "'at

issue' through their legal contentions on the motion to enforce settlement." *Id*. Plaintiffs oppose

Defendants' arguments on the merits. In addition, Plaintiffs also respond that Defendants' Joint

Motion to Declare Partial Waiver of Attorney-Client Privilege is moot because there is no

evidence that a full and final settlement agreement was ever reached. The Court will first address

Plaintiffs' argument that Defendants' motion is "moot."

## A.  Mootness

Plaintiffs argue that Defendants' motion is moot because there is no evidence that a full

and final settlement agreement was ever reached. Plaintiffs correctly state that an "acceptance

must be positive, unconditional, unequivocal and unambiguous, and must not change, add to, or

qualify the terms of the offer." *Wagner v. Rainier Mfg. Co.*, 230 Or. 531, 538 (1962) (quotation

marks omitted). Plaintiffs also correctly note that a response to an offer that does "not embody

the same terms as the earlier offer" is "not an acceptance. It [i]s instead a counteroffer." *Lang v.*

*Oregon-Idaho Annual Conf. of United Methodist Church*, 173 Or. App. 389, 395 (2001).

Plaintiffs then observe that, even under Defendants' account of the facts, Defendant

Dr. Soldevilla and his business, Defendant Northwest Neurosurgical Associates, LLC, did not

PAGE 8 – OPINION AND ORDER

accept Plaintiffs' supposed offer. Instead, Dr. Soldevilla demanded an additional letter for his file, confirming that no money was paid by him or his company in exchange for the mutual releases and dismissal. Plaintiffs assert that this is a rejection by counter offer. *See C.R. Shaw Wholesale Co. v. Hackbarth*, 102 Or. 80, 96 (1921) ("The counter offer is construed as being in effect a statement by the offeree, not only that he will enter into the transaction on the terms stated in his counter offer, but also by implication that he will not assent to the terms of the original offer.") (citing 1 WILLISTON ON CONTRACTS § 51). Thus, conclude Plaintiffs, the supposed global settlement offer was never accepted by *all* Defendants and the question of whether Plaintiffs' counsel had authority to settle, or even whether Dr. Roberts waived his attorney-client privilege, is moot. Plaintiffs state that Defendants' pending motion regarding waiver should be denied on this basis alone.

Plaintiffs' mootness argument fails for several reasons. First, even if there were no final agreement reached between Plaintiffs and Dr. Soldevilla and his business, it does not affect whether a final agreement had been reached between Plaintiffs and the other Defendants. There is no evidence presented (or any argument offered) that any of the other Defendants made any counter offer to Plaintiffs. There also is no evidence or argument that Plaintiffs' supposed settlement offer, as allegedly communicated by Plaintiffs' counsel, was contingent on being accepted by all Defendants. Indeed, the evidence presented appears to the contrary. Thus, even if the waiver issue might be moot regarding Dr. Soldevilla, it is not moot for the other Defendants.

Second, Defendants offer evidence, including a declaration from Dr. Soldevilla's counsel, that the counter offer from Dr. Soldevilla demanding a factually accurate letter was, in fact, accepted by Plaintiffs' attorney, Mr. McDougal. If that is correct, and if Mr. McDougal had his clients' actual authority to accept, then the acceptance of the counter offer would create an

enforceable settlement agreement. Thus, Plaintiffs' mootness argument assumes that there was

no enforceable agreement; it does not prove it. And in the absence of proof that there was no

enforceable agreement, the pending dispute over the attorney-client privilege is not moot.[2]

## B.  Intention to Maintain Confidentiality

Before addressing whether Plaintiffs waived, either expressly or implicitly, their

attorney-client privilege, the Court examines Defendants' argument that at least some of the

communications between Dr. Roberts and his attorney were never privileged in the first place

because they were intended to be passed along to third parties, namely defense counsel. In order

to be protected under the attorney-client privilege against compelled disclosure, a

communication between a client and his or her attorney must be "confidential." Rule 503(1)(b)

of the Oregon Evidence Code ("OEC") (codified at Or. Rev. Stat. § 40.225) defines a

"confidential communication" as "a communication not intended to be disclosed to third persons

other than those to whom disclosure is in furtherance of the rendition of professional legal

services to the client or those reasonably necessary for the transmission of the communication."

If a client were to instruct his or her counsel to convey certain information, for example, a

settlement offer, to counsel for an opposing party, that instruction would not be a "confidential

communication" and, thus, would not be protected under the attorney-client privilege. Plaintiffs

respond by asserting that there never were any such instructions given by Plaintiffs to their

then-counsel.

---

[2] In their reply, Defendants also argue that an attorney always has the "apparent" authority to accept "subsidiary" terms in a settlement agreement and need only have "actual" authority to accept its "core" terms. In support of this proposition, Defendants cite *Kaiser Foundation Health Plan v. Doe*, 136 Or. App. 566, 572-73 (1995). Defendants add that the counter offer by Dr. Soldevilla that demanded a factually accurate letter is only a subsidiary term, not a core term, of the alleged settlement agreement. The Court does not need to reach this question in order to resolve the pending motion regarding waiver, including Plaintiffs' mootness argument, and declines to do so until the factual record has been more fully developed.

Defendants correctly assert that only communications to a client's attorney that are intended by the client to be kept confidential are protected under the attorney-client privilege. That is Defendants' major premise. Defendants add as their minor premise that Dr. Roberts authorized his then-attorney to present a settlement offer to Defendants and thus did not intend his communications to his then-attorney to be kept confidential. Thus, conclude Defendants, Dr. Roberts' communications to his then-attorney are not privileged and must be disclosed. There is no actual proof, however, of Defendants' minor premise. Defendants provide no evidence that Dr. Roberts actually authorized his then-attorney to present a settlement offer to Defendants. The truth of this minor premise is simply "assumed" in Defendants' argument.

Defendants' argument contains aspects that are similar to examples of circular reasoning, or "begging the question," where the conclusion simply assumes the answer. The "proof" in a circular argument is not a conclusion that is logically drawn from the premises of the argument. Instead, the conclusion merely assumes the truth of one of the premises. In a circular argument, the "proof" assumes the answer, rather than proves it. The fallacy of "begging the question" or "circular argument," more formally known as the fallacy of *petitio principii* (literally, assuming the initial point), results from assuming in the premises that which is sought to be proven in the conclusion. As explained in PAUL BOSANAC, LITIGATION LOGIC: A PRACTICAL GUIDE TO EFFECTIVE ARGUMENT (2009):

> Circular argument, circular reasoning, *petition principii*, vicious circle—each is another name for begging the question.
>
> One way to recognize this argument is to focus on the proof for the asserted conclusion. Has independent evidence sufficient to establish the conclusion been demonstrated? Or, has there merely been a reassertion or restatement of the conclusion, using other words, presumed to be true, to describe the conclusion? Isolating proof from the conclusion is not always a simple task.

PAGE 11 – OPINION AND ORDER

*Id.* at 293; *see generally* RUGGERO J. ALDISERT, LOGIC FOR LAWYERS: A GUIDE TO CLEAR LEGAL THINKING, 201-207 (1989). Because Defendants have presented no evidence that Dr. Roberts's actual communications to his attorney were not intended to be kept confidential, Defendants' argument is without merit.

## C.  Express Waiver, or Waiver by Voluntary Disclosure

Even if Dr. Roberts' communications with his attorney were intended to be kept confidential and thus presumptively entitled to protection under the attorney-client privilege, Defendants argue that Plaintiffs expressly[3] waived their attorney-client privilege through voluntary disclosure. Defendants rely upon both OEC 511 (codified at Or. Rev. Stat. § 40.280) and Rule 502(a) of the Federal Rules of Evidence ("FRE")[4] for the proposition that the holder of an attorney-client privilege waives that privilege by voluntarily disclosing or consenting to the disclosure of any significant part of the privileged matter or communication. Defendants then assert that Plaintiffs "have voluntarily waived their attorney-client privilege by filing a declaration describing the substance of Dr. Roberts' communications with McDougal." In their reply, Defendants state:

> The disclosed information that Dr. Roberts did not authorize
> McDougal to settle the case is *just as substantive* as any
> communication or information between Dr. Roberts and McDougal

---

[3] "An express waiver occurs when a party discloses privileged information to a third party who is not bound by the privilege, or otherwise shows disregard for the privilege by making the information public." *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).

[4] OEC 511 provides in relevant part: A person holding a privilege against disclosure of a confidential matter or communication "waives the privilege if the person . . . voluntarily discloses or consents to disclosure of any significant part of the matter or communication." FRE 502(a) provides in relevant part: The "disclosure of a communication or information covered by the attorney-client privilege" in a federal proceeding "waives the attorney-client privilege" with regard "to an undisclosed communication or information" only if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."

PAGE 12 – OPINION AND ORDER

> authorizing a settlement. Thus, because plaintiffs have voluntarily
> disclosed the *substance* of their alleged communication with
> McDougal regarding settlement authority, they have waived the
> privilege on all communications concerning the same subject
> matter.

Dkt. 143, at 6 (emphasis in original).

The error in Defendants' argument, however, is that Dr. Roberts, in his declaration, did not disclose, reveal, or describe, in whole or in part, the substance of any confidential communication that he actually had with his attorney, Mr. McDougal. Dr. Roberts stated in his declaration what he did not say, but that is not the same thing as disclosing even a portion of a confidential communication that did take place. Whatever Dr. Roberts may have told his attorney, Mr. McDougal, in confidence, including about Dr. Roberts's interest or lack of interest in settlement, was not revealed by Dr. Roberts in his declaration. That is the end of the analysis, at least regarding the question of whether there was an express waiver of the attorney-client privilege by voluntary disclosure.

The case law is well settled that disclosing the fact that there were confidential communications between a client and his or her attorney—or even disclosing that certain subjects confidentially were discussed between a client and his or her attorney—does not constitute a waiver by partial disclosure. As explained in one treatise:

> Merely disclosing the fact that there were communications or that
> certain subjects were discussed, however, does not constitute a
> partial disclosure. *The disclosure must be of confidential portions
> of the privileged communications*. This does not include the fact of
> the communication, the identity of the attorney, the subject
> discussed, and details of the meetings, which are not protected by
> the privilege.

2 PAUL R. RICE, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 9:30 at 153-56 (2014) (emphasis added) (footnotes omitted) (citing cases). Because Dr. Roberts's declaration does not

PAGE 13 – OPINION AND ORDER

disclose any confidential portions of any privileged communications between Dr. Roberts and

his attorney, there is no express waiver by voluntary disclosure.

## D.  Implied Waiver, or Waiver by Claim Assertion

Even if there is no express waiver of the attorney-client privilege, an implied waiver may

be found. A waiver may be found "by implication from client conduct that is inconsistent with

any reasonable claim of confidentiality and that would make maintenance of the privilege

unfair." 2 RICE, ATTORNEY-CLIENT PRIVILEGE § 9:24 at 89 (footnote omitted) (citing cases). As

this treatise further explains:

> When the client makes the communications with counsel a
> substantive issue in the litigation, courts have consistently held that
> the attorney-client privilege protecting those communications is
> waived. Courts often refer to this type of waiver as an "at issue"
> waiver or an implied waiver. A client will be required to disclose
> privileged attorney-client communications whenever she is
> perceived as placing, directly or indirectly, those communications
> "at issue" in the cause of action. The principle upon which this
> implied waiver concept is based is simple "fairness."

*Id*. § 9:45 at 277-79 (footnote omitted).

Professor Rice's treatise continues:

> When clients have injected issues into actions, the fair resolution
> of which required the disclosure of confidential attorney-client
> communications, courts have concluded that these acts waived the
> attorney-client privilege protection. The scope of these waivers has
> been sufficiently broad to give the opposing party a *fair
> opportunity* to examine all communications that may be *pertinent*
> to those issues. The *Hearn v. Rhay*[, 68 F.R.D. 574, 577 (E.D. Wa.
> 1975),] opinion that established the precedent for implied waivers
> indicated that such waivers only extend to communications that are
> "vital" to the opposing party's ability to fairly present its case.
> "Vital implies a level of probative value significantly greater than
> mere relevance," and such a standard would be consistent with the
> belief that implied waivers must be "closely tailored" to protect the
> privileges at issue. Nevertheless, courts need to be primarily
> concerned with not permitting the privilege holder from placing
> the opposing party in an untenable position by injecting an issue

> into the litigation and then hiding behind the privilege to preclude
> its fair and complete resolution.

*Id*. § 9:55 at 480 (footnotes omitted) (emphasis in original).

The U.S. Court of Appeals for the Ninth Circuit has adopted this doctrine of implied

waiver of the attorney-client privilege. In the context of a federal habeas petition raising several

claims, including ineffective assistance of counsel, the Ninth Circuit observed:

> "[T]he doctrine of implied waiver allocates control of the privilege
> between the judicial system and the party holding the privilege."
> [*Developments in the Law—Privileged Communications*], 98 Harv.
> L. Rev. [1450,] 1630 [(1985)]. The court imposing the waiver does
> not order disclosure of the materials categorically; rather, the court
> directs the party holding the privilege to produce the privileged
> materials *if* it wishes to go forward with its claims implicating
> them. The court thus gives the holder of the privilege a choice: If
> you want to litigate this claim, then you must waive your privilege
> to the extent necessary to give your opponent a fair opportunity to
> defend against it. *See, e.g.*, [*United States v.*] *Amlani*, 169 F.3d
> [1189,] 1195 [(9th Cir. 1999)] (holding that courts must evaluate
> "whether allowing the privilege would deny the opposing party
> access to information vital to its defense" (internal quotation marks
> omitted)); *Chevron* [*Corp. v. Pennzoil Co.*], 974 F.2d [1156,] 1162
> [(9th Cir. 1992)]. Essentially, the court is striking a bargain with
> the holder of the privilege by letting him know how much of the
> privilege he must waive in order to proceed with his claim.
>
> Three important implications flow from this regime. The first is
> that the court must impose a waiver no broader than needed to
> ensure the fairness of the proceedings before it. . . .
>
> Second, the holder of the privilege may preserve the confidentiality
> of the privileged communications by choosing to abandon the
> claim that gives rise to the waiver condition…..
>
> Finally, if a party complies with the court's conditions and turns
> over privileged materials, it is entitled to rely on the contours of
> the waiver the court imposes, so that it will not be unfairly
> surprised in the future by learning that it actually waived more than
> it bargained for in pressing its claims.

*Bittaker v. Woodford*, 331 F.3d 715, 720-21 (9th Cir. 2003); *see also* JOSEPH M. MCLAUGHLIN,

JACK B. WEINSTEIN, AND MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 503.41[1]

PAGE 15 – OPINION AND ORDER

(2d ed. 2014) (discussing the doctrine of implied waiver). In addition, the leading treatise on Oregon evidence law is similar. *See* LAIRD C. KIRKPATRICK, OREGON EVIDENCE § 503.13[1], § 503.13[3] (6th ed. 2013).

Applying these principles to the facts before the Court, Defendants present evidence that they reached a settlement agreement with Plaintiffs, acting through Plaintiffs' counsel, and Defendants seek to enforce that agreement. Defendants' evidence included declarations from defense counsel stating that Plaintiffs' then-counsel, Mr. McDougal, had represented that Plaintiffs would settle the lawsuit on certain terms that Mr. McDougal described and that Defendants accepted, or at least all Defendants except Dr. Soldevilla and his business. In opposing that motion, Plaintiffs respond with Dr. Roberts's declaration asserting that Mr. McDougal did not have Plaintiffs' authority to make the representations that Mr. McDougal made. Plaintiffs, through Dr. Roberts's declaration, thereby injected the defense that Mr. McDougal did not have the actual authority needed to bind Plaintiffs to a settlement. Thus, Plaintiffs placed "at issue" whether Mr. McDougal had actual authority from his clients to extend the settlement offers that he made. Moreover, the only way for Defendants to be able fairly to refute—or confirm—Dr. Roberts's assertion is to inquire into otherwise privileged communications. It simply would not be fair to allow Dr. Roberts, in opposing Defendants' motion to enforce settlement, to rely on his statement that he did not authorize his attorney to present a settlement offer to counsel for Defendants while also allowing Dr. Roberts to invoke his attorney-client privilege to prevent Defendants from confirming or refuting that statement.

In applying the doctrine of implied waiver by claim assertion, or "at issue" waiver, a court must be careful to ensure that this concept is used only to prevent the type of unfairness that is distinguishable from "the unavoidable unfairness generated by every assertion of

PAGE 16 – OPINION AND ORDER

privilege." *Developments in the Law—Privileged Communications*, 98 HARV. L. REV. 1450, 1642 (1985). This Court has done so and has reached the same conclusion that has been reached in other similar cases. *See, e.g., Rubel v. Lowe's Home Centers, Inc.*, 580 F. Supp. 2d 626, 628-29 (N.D. Ohio 2008) (holding that, in response to the defendant's motion to enforce settlement agreement, the plaintiff waived attorney-client privilege by voluntarily testifying by affidavit and in deposition that he neither agreed to settle nor authorized his attorney to do so); *Hodges v. Potter*, 2005 WL 6336682, at *2 (D.D.C. Aug. 31, 2005) (holding that, in response to the defendant's motion to enforce settlement agreement, the plaintiff waived attorney-client privilege when he "voluntarily disclosed in his opposition the partial content of his previously privileged communications with his attorney in an attempt to defend against enforcement of the settlement agreement"); *Hartman v. Hooks-Superx, Inc.*, 42 F. Supp. 2d 854, 855 (S.D. Ind. 1999) (holding that, in response to the defendant's motion to enforce settlement agreement, the plaintiff may not continue to invoke attorney-client privilege while also maintaining that his attorney lacked settlement authority).

If Dr. Roberts continues to invoke his attorney-client privilege in order to prevent Defendants from refuting or confirming Dr. Roberts's statement that his then-attorney, Mr. McDougal, lacked actual settlement authority, Plaintiffs will have impliedly waived by claim assertion their attorney-client privilege on that issue. In light of the Court's ruling, Dr. Roberts, in all fairness, should be given an opportunity to decide whether to continue to offer his statement in opposition to Defendants' motion to enforce settlement. Moreover, if Dr. Roberts decides to continue to rely on his statement that he did not authorize his counsel to extend the settlement offers at issue, then waiver will be found and discovery into previously privileged communications between Dr. Roberts and his counsel will be permitted.

## CONCLUSION

Defendants' Joint Motion to Declare Partial Waiver of Attorney-Client Privilege

(Dkt. 137) is GRANTED IN PART. Within seven days from the date of this Opinion and Order,

Dr. Roberts shall notify the Court and the parties whether he intends to continue to rely on his

statement that he did not authorize his then-counsel to extend the alleged settlement offers (or to

accept Dr. Soledevilla's counter offer). If Dr. Roberts intends to continue to assert that position,

Defendants may serve a subpoena *duces tecum* on Plaintiffs' former-counsel, Mr. McDougal,

and may take the deposition of Mr. McDougal, all in accordance with the contingencies and

limitations set forth in this Opinion and Order. In lieu of such a deposition, however, upon

request by any party, the Court will hold an evidentiary hearing during which Mr. McDougal

may be examined by all parties, also in accordance with the limitations set forth in this Opinion

and Order. If any party requests such an evidentiary hearing in lieu of a deposition, the parties

shall coordinate the date and time of such a hearing with the Courtroom Deputy.

**IT IS SO ORDERED**.

DATED this 10th day of April, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge