# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **WARREN G. ROBERTS, M.D., F.A.A.N.S.,** **an individual, and ASPEN SPINE AND** **NEUROSURGERY CENTER, P.C., an** **Oregon professional corporation**, | Case No. 3:13-cv-01136-SI |
| Plaintiffs, | |
| v. | **FINDINGS OF FACT AND** **CONCLUSIONS OF LAW** |
| **LEGACY MERIDIAN PARK HOSPITAL,** **INC., an Oregon non-profit corporation,** **d/b/a/ LEGACY MERIDIAN PARK** **MEDICAL CENTER, an Oregon assumed** **business name; FRANCISCO X.** **SOLDEVILLA, M.D., an individual;** **NORTHWEST NEUROSURGICAL** **ASSOCIATES, LLC, an Oregon limited** **liability corporation**, **ROBERT L.** **TATSUMI, M.D., an individual; TIMOTHY** **L. KEENEN, M.D., an individual; PACIFIC** **SPINE SPECIALISTS, LLC, an Oregon** **limited liability corporation; and ANDREW** **B. CRAMER, M.D., an individual**, | |
| Defendants. | |

Micah D. Fargey, FARGEY LAW PC, 5 Centerpointe Drive, Fourth Floor, Lake Oswego, OR 97035. Of Attorneys for Plaintiffs.

Keith S. Dubanevich and Keil M. Mueller, STOLL STOLL BERNE LOKTING & SHLACHTER, P.C., 209 S.W. Oak Street, Suite 500, Portland, OR 97204. Of Attorneys for Defendants Legacy Meridian Park Hospital, Inc. and Andrew B. Cramer, M.D.

Robert D. Scholz and Megan L. Farris, MACMILLAN SCHOLZ & MARKS, P.C., 900 S.W. Fifth Avenue, Suite 1800, Portland, OR 97204. Of Attorneys for Defendants Northwest Neurosurgical Associates, LLC and Francisco X. Soldevilla, M.D.

Elizabeth E. Lampson and Christopher M. Parker, DAVIS ROTHWELL EARLE & XOCHIHUA, P.C., 111 S.W. Fifth Avenue, Suite 2700, Portland, OR 97204. Of Attorneys for Defendant Pacific Spine Specialists, LLC.

Karen M. O'Kasey and Calliste J. Korach, HART WAGNER, LLP, 1000 S.W. Broadway, Suite 2000, Portland, OR 97205. Of Attorneys for Defendant Timothy L. Keenen, M.D.

Jeffrey W. Hansen, Stephen R. Rasmussen, and Joseph A. Rohner, IV, SMITH FREED & EBERHARD, P.C., 111 S.W. Fifth Avenue, Suite 4300, Portland, OR 97204, and James L. Dumas and Michael J. Estok, LINDSAY HART, LLP, 1300 S.W. Fifth Avenue, Suite 3400, Portland, OR 97201. Of Attorneys for Defendant Robert L. Tatsumi, M.D.

**Michael H. Simon, District Judge.**

Defendants assert that this lawsuit has been fully settled by an agreement reached with Plaintiffs through Plaintiffs' then-counsel acting within the scope of his express authority. Plaintiffs disagree. Plaintiffs first argue that they never authorized their then-counsel to offer the settlement terms that Defendants contend they accepted. Alternatively, Plaintiffs argue that Defendants rejected by counteroffer Plaintiffs' proposed settlement. Defendants jointly move to enforce the asserted settlement agreement and ask the Court to dismiss Plaintiffs' claims with prejudice, consistent with that agreement. Dkt. 123. Plaintiffs oppose Defendants' motion. A two-day evidentiary hearing was held before the Court on August 6, 2015, and September 11, 2015. For the reasons that follow, Defendants' joint motion is GRANTED. This case is dismissed with prejudice.

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

## FINDINGS OF FACT[1]

Based on the record in this case and the evidence adduced at the two-day evidentiary hearing held on August 6, 2015, and September 11, 2015, the Court finds the following facts by a preponderance of the evidence:

1.      Plaintiff, Warren G. Roberts, M.D., is a neurological surgeon and the owner of Plaintiff Aspen Spine and Neurosurgery Center, P.C. (collectively, "Plaintiffs").

2.      In Plaintiffs' Fourth Amended Complaint, Plaintiffs allege claims of tortious interference with economic relations, breach of contract, intentional infliction of emotional distress, racial discrimination in violation of state and federal law, and conspiracy to restrain trade and attempted monopolization in violation of state and federal antitrust laws. Plaintiffs' claims are asserted against the following seven named defendants: (a) Legacy Meridian Park Hospital, Inc.; (b) Andrew B. Cramer, M.D.; (c) Northwest Neurosurgical Associates, LLC; (d) Francisco X. Soldevilla, M.D.; (e) Pacific Spine Specialists, LLC; (f) Timothy L. Keenen, M.D.; and (g) Robert L. Tatsumi, M.D. Dkt. 102.

3.      Plaintiffs commenced this action in Multnomah County Circuit Court on May 16, 2013 against six named Defendants and Defendants "Does 1-5."[2] Plaintiffs' original Complaint alleged only Oregon common law claims and violations of Oregon statutory law. There was

---

[1] Docket entries are referred to as "Dkt." Exhibits received at the evidentiary hearing are referred to as "Ex." followed by the specific page number of that exhibit. Testimony received at the evidentiary hearing is referred to as "Tr." followed by a citation to the transcript page number and, in parentheses, the last name of the witness. The transcript from the first day of the hearing, August 6, 2015, appears at Dkt. 180 and contains the testimony of Mark McDougal ("McDougal") and Dr. George Brown ("Dr. Brown"). The redacted transcript from the second day of the hearing, September 11, 2015, appears at Dkt. 183 and contains the testimony of Donna Engelman ("Engelman") and Dr. Warren Roberts ("Dr. Roberts").

[2] Plaintiffs' Fourth Amended Complaint no longer includes any "Doe" Defendants in the case caption but continues to allege the existence of "persons whose identity is as yet unknown" to Plaintiffs. *See* Dkt. 102, ¶ 10.

incomplete diversity among the parties. Plaintiffs filed an Amended Complaint in state court on June 28, 2013, adding a federal discrimination claim under 42 U.S.C. § 1985. On July 8, 2013, Defendants timely removed the lawsuit to federal court. Dkt. 1. On August 7, 2013, Plaintiffs filed a Second Amended Complaint, adding federal antitrust claims and an additional federal discrimination claim. In their Second Amended Complaint, Plaintiffs requested compensatory damages, statutory treble damages, and punitive damages, as well as declaratory and injunctive relief. Dkt. 9. On October 16, 2013, Plaintiffs filed a Third Amended Complaint, adding an additional named defendant. Dkt. 28. On October 30, 2013, Defendant Legacy Meridian Park Hospital moved to dismiss a portion of Plaintiffs' Third Amended Complaint. Dkt. 33. Several other Defendants later joined in that motion or filed similar motions.

4.      On December 23, 2013, Plaintiffs filed a motion to compel discovery of certain medical peer review information. Dkt. 77. On January 21, 2014, Defendant Legacy Meridian Park Hospital moved for a protective order, seeking both an *in camera* inspection of certain documents and an order sequencing discovery. Dkts. 91, 92.

5.      On January 24, 2014, the Court granted in part and denied in part Defendants' motions to dismiss. Dkt. 98. Plaintiffs filed their Fourth Amended Complaint on February 25, 2014. Dkt. 102.

6.      On March 3, 2014, Plaintiffs changed counsel. Until that time, Plaintiffs had been represented by attorneys Matthew A. Levin ("Levin"), Lawson E. Fite ("Fite"), and Lauren F. Blaesing ("Blaesing") of Markowitz, Herbold, Glade & Mehlhaf, P.C. On March 3, 2014, Plaintiffs substituted Gregory Kafoury ("Kafoury") and Mark McDougal ("McDougal") of Kafoury & McDougal as attorneys of record in place of attorneys Levin, Fite, and Blaesing of the Markowitz law firm. Dkt. 105.

PAGE 4 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

7.      McDougal is a lawyer practicing in Oregon in good standing since 1989. Tr. 18 (McDougal). McDougal and Kafoury formed their law firm in 1996. They specialize in representing individuals "who are hurt or harmed by corporations or others with insurance." McDougal estimates that he has represented approximately 4,000 individuals. Tr. 20-21 (McDougal). McDougal testified that he has never settled a case without obtaining his client's prior express authority to do so. Tr. 22 (McDougal).

8.      On March 25, 2014, Defendants Legacy Meridian Park Hospital and Dr. Cramer answered the Fourth Amended Complaint and asserted counterclaims for attorney's fees, among other relief. Their first counterclaim sought prevailing party attorney's fees under the federal Health Care Quality Improvement Act, specifically 42 U.S.C. § 11113. Their second counterclaim sought prevailing party attorney's fees pursuant to Section 11.B.2(z) of the Legacy Meridian Park Hospital Medical Staff Bylaws, to which, these Defendants allege, Dr. Roberts had contractually agreed to abide. Their third counterclaim alleged breach of contract by Dr. Roberts, specifically the Legacy Meridian Park Hospital Medical Staff Bylaws, and sought contract damages in the form of attorney's fees, expert witness fees, and other fees and costs necessary to defend against Dr. Roberts's claim. Dkt. 109.

9.      On April 25, 2014, the Court granted Plaintiffs' motion to compel discovery and granted in part Defendants' motion for a protective order. Dkt. 111. During the summer of 2014, Defendant Legacy Meridian Park Hospital produced the requested medical peer review information to Plaintiffs' counsel, Kafoury & McDougal, pursuant to the Court's protective order. Tr. 26 (McDougal); Tr. 63 (Dr. Roberts).

10.     At various times, Dr. Roberts discussed this lawsuit with attorney Mark Bonanno ("Bonanno"), who is the General Counsel and Director of Health Policy at the Oregon Medical

Association. By email dated October 15, 2014, Bonanno wrote to Dr. Roberts to "update" Dr. Roberts on Bonanno's meeting with McDougal on October 14, 2014. As explained by Bonanno to Dr. Roberts: "You seem to be in good hands with Mark [McDougal], and I firmly believe in deferring to just one 'captain of the ship' when it comes to litigation. . . . I know litigation can be stressful, so I let Mark know that if you wanted to call me for another sounding board, I was glad to take the time." Ex. 1, p. 3.

11.      On October 16, 2014, Dr. Roberts met with his then-attorney, McDougal, in McDougal's office. Tr. 27, 32 (McDougal). Dr. Roberts and McDougal had been having a series of meetings about Dr. Roberts's case. The meeting on October 16th was "a continuation of that series" of discussions. Tr. 32 (McDougal). The purpose of the meeting on October 16th was "to talk about problems with his case." Tr. 32 (McDougal).[3] McDougal described for Dr. Roberts the problems that McDougal saw in the case. Tr. 38-39 (McDougal). McDougal also explained that his law firm needed to withdraw as counsel, and they discussed settlement and abatement as possibilities. Tr. 33 (McDougal). The settlement possibility that was discussed was a "complete walkaway by everyone." Tr. 33 (McDougal). McDougal also explained that Dr. Roberts could try to find another attorney, which would have been Plaintiffs' third set of lawyers, but Dr. Roberts "didn't want to try to do that." Tr. 40 (McDougal). During this meeting, Dr. Roberts told McDougal that Dr. Roberts "wanted to get things resolved." Tr. 30 (McDougal).

12.      Dr. Roberts also had been having a series of discussions about the lawsuit with Dr. George Brown. Tr. 29 (McDougal). Dr. Brown is the President and Chief Executive Officer of Legacy Health System, a medical system that includes Defendant Legacy Meridian Park

---

[3] At the evidentiary hearing held on August 6, 2015, Dr. Roberts waived his attorney-client privilege with regard to the advice that he received from his then-attorney, McDougal, at their meeting on October 16, 2014. Tr. 38.

Hospital. Tr. 122-23 (Dr. Brown). Dr. Roberts was trying to move his medical practice to Good

Samaritan Hospital (which is also part of the Legacy Health System) in order to "start new

relationships." Tr. 40 (McDougal).

13.     Dr. Brown had been having a number of conversations with Dr. Roberts over the

months leading up to October 2014. Dr. Roberts had expressed his desire to get along with his

colleagues at Legacy Meridian Park and just get on with the practice of neurosurgery. Dr. Brown

told Dr. Roberts that "it is difficult to get along with your colleagues when you are suing them."

Tr. 123-24 (Dr. Brown).

14.     On October 16, 2014, McDougal recommended that Dr. Roberts follow up with

Dr. Brown. Tr. 40 (McDougal). According to McDougal, if McDougal were just to "withdraw

from the case" and Dr. Roberts couldn't "find another attorney," then Dr. Roberts would not be

"getting anything out of it. It [the lawsuit] is just going to go away." Tr. 40 (McDougal).

McDougal then suggested to Dr. Roberts that Dr. Roberts:

> A.      * * * should at least get what he can out of it by doing what
> George Brown asked, and it was going to be him [Dr. Roberts]
> going to George Brown, it being his idea – not that it was his idea.
> I mean, he was dismissing the case because I was withdrawing,
> and he didn't think he could find another attorney. And he
> understood the problems, I thought, of the case that I told him
> about. So it was actually because of what I was doing that he went
> to George Brown and made it as though it was his idea so he could
> perhaps get a benefit from it.

Tr. 40-41(McDougal).

15.     McDougal also testified about how this meeting with Dr. Roberts on October 16th

ended:

> Q.      So when the meeting ended on October 16th, what was
> your understanding of what was going to happen next?
>
> A.      My understanding was he [Dr. Roberts] was going to think
> about it. And if he decided to dismiss it, he was going to tell

PAGE 7 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

George Brown. And once he did that, I was supposed to go into action.

Q.      Presumably you would be notified?

A.      Yes.

Q.      Of his conversation with Dr. Brown?

A.      Yes.

Q.      All right.

THE COURT: When you say "go into action," explain what that meant or what that means.

THE WITNESS: Carry out the settlement.

THE COURT: So a bit more specific: After you were to be notified by Dr. Roberts that he spoke with Dr. Brown, what were you then going to do?

THE WITNESS: Call up everybody and do the walkaway that he [Dr. Roberts] told George Brown that he was going to do – Dr. Brown, sorry.

Tr. 41 (McDougal). According to McDougal, after the meeting with Dr. Roberts ended on Thursday, October 16, "it was my understanding that he [Dr. Roberts] was going to think about it, and if he decided to do the walkaway, he would tell Dr. Brown himself and let me know." Tr. 34 (McDougal).

16.      At the evidentiary hearing, Dr. Brown described a specific telephone conversation that he had with Dr. Roberts on October 17, 2014. Dr. Roberts called Dr. Brown that day. As Dr. Brown explained: "In essence, Dr. Roberts called me and said that he was dismissing the lawsuit and that he hoped that this would be a catalyst to allow him to get along with his colleagues and allow him to practice neurosurgery. I asked him if it was his intent to notify his attorney. He said yes, and I said, well, I would do the same with our general counsel." Dr. Brown added that

Dr. Roberts "said he was going to instruct his lawyers to contact our general counsel that the lawsuit would be dismissed." Tr. 124 (Dr. Brown).

17.     That same day, Friday, October 17, 2014, at 10:05 a.m., Dr. Roberts sent a text message to his then-attorney, McDougal, concerning Dr. Roberts's conversation with Dr. Brown. The text message read, in its entirety: "George brown [*sic*] notified of case dismissal. Warren [Roberts.]" Ex. 101-1; Tr. 42 (McDougal). McDougal received this text message from Dr. Roberts on October 17th and then placed calls to all defense counsel. McDougal reached some personally and left voice mail messages for others. McDougal told everyone that "Dr. Roberts will dismiss his suit if there is a complete walkaway by everybody – no fees, costs to anyone." Tr. 43 (McDougal). McDougal understood and explained that this "had to be a complete walkaway by everybody." Tr. 24 (McDougal).

18.     Dr. Roberts testified, however, that by his text message he only intended to inform McDougal that Dr. Roberts had told Dr. Brown that Dr. Roberts was merely considering the possibility of dismissing the lawsuit. Tr. 78-80, 109-110 (Dr. Roberts). Based on all of the evidence presented, the Court does not find Dr. Roberts's testimony on this point to be credible.

19.     McDougal believed, and continues to believe, that he had the "clear and express authority to offer a walkaway dismissal of this case with prejudice and without costs to any party." Tr. 24-25 (McDougal).

20.     The defense counsel who were reached by McDougal said that they were "pretty sure that they could get that approval" and that they would get back to McDougal; thus, no acceptances had been extended on Friday, October 17, 2014. Tr. 44 (McDougal).

21.     McDougal left for vacation on Sunday, October 19. Tr. 35 (McDougal). He remained in contact with his office through his paralegal, Donna Engelman. Tr. 12 (Engelman).

PAGE 9 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

22.    On Monday, October 20, 2014, at 9:36 a.m., Defendants Dr. Robert L. Tatsumi and Pacific Spine Specialists, LLC accepted Plaintiffs' settlement offer. Ex. 101-24 (email); Dkt. 154, ¶ 2 (Declaration of Stephen R. Rasmussen).

23.    On Monday, October 20, 2014, at 11:35 a.m., counsel for Defendants Dr. Francisco X. Soldevilla and Northwest Neurosurgical Associates, LLC, Robert D. Scholz ("Scholz") sent an email to Plaintiffs' then-counsel, McDougal. That email states in full:

> Following up our telephone call a few minutes ago: Dr. Soldevilla is agreeable to a dismissal with prejudice and without costs or fees (he has a counterclaim for attorney fees), but as a condition wants for his file a letter signed by Dr. Roberts that no money was paid or other consideration given by Dr. Soldevilla to Dr. Roberts for the dismissal and that Dr. Roberts retracts the claims against Dr. Soldevilla made in the lawsuit.

Ex. 101-22 (email); Dkt. 128, ¶ 1 (Declaration of Robert D. Scholz). Dr. Soldevilla's "condition" was later clarified during a telephone conversation on November 4th between Scholz and McDougal. *See* ¶ 34, *infra*.

24.    On Tuesday, October 21, 2014, at 12:49 p.m., Defendants Dr. Timothy L. Keenen and Pacific Spine Specialists, LLC accepted Plaintiffs' settlement offer. Ex. 102 (email); Dkt. 155, ¶ 2 (Supplemental Declaration of Calliste J. Korach).

25.    "Sometime during the week of October 20," counsel for Defendants Legacy Meridian Park Hospital and Dr. Cramer spoke by telephone with a paralegal from McDougal's office and confirmed that these two Defendants also had "agreed to dismiss their counterclaims and waive any claims for fees and costs in exchange for the plaintiffs' dismissal of the case with prejudice." Dkt. 125, ¶ 7 (Declaration of Keith S. Dubanevich).

26.    After speaking with McDougal and receiving word of Plaintiffs' settlement offer, all Defendants stopped working on this case, including preparing for Dr. Roberts's upcoming deposition, which had been scheduled for November 17, 2014. On October 29, 2014, "after

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

receiving confirmation from counsel for all of the other defendants that the form of the stipulation [he] had prepared was acceptable to their clients, [counsel for Defendants Legacy Meridian Park Hospital and Dr. Cramer] sent a draft stipulation of dismissal to plaintiffs' then-counsel, Mark McDougal." Dkt. 126, ¶ 3 (Declaration of Keil M. Mueller); *see also* Ex. 101-66.

27.    The Court finds that Plaintiffs expressly authorized their then-attorney, McDougal, to extend "walkaway" settlement offers to all Defendants, provided that all Defendants agreed. This finding is based on the combination of Dr. Roberts's statements to McDougal on October 16th and Dr. Roberts's text message to McDougal on October 17th. Dr. Roberts, however, did not believe that this case would be dismissed until after McDougal returned from his vacation in early November.

28.    On October 20, 2014, at 7:31 a.m., Dr. Roberts sent the following message by email to McDougal:

> I have now had a bit more time to consider case options. I would like to speak with you about case abatement.
>
> Let me know a good time that works for you. Please do not dismiss case until we have a chance to discuss this.

Ex. 101-20.

29.    On Monday, October 20, 2014, Dr. Roberts spoke again with Bonanno of the Oregon Medical Association. Ex. 1, p. 2. Bonanno offered "to put some feelers out for alternate counsel . . . ." Ex. 1, p. 2.

30.    The next day, Tuesday, October 21, 2014, McDougal dictated to his paralegal, Engelman, the following response to Dr. Roberts, which she sent to Dr. Roberts by email at 11:47 a.m. McDougal's response was as follows:

> As we discussed Thursday, you were going to talk to George Brown and I was going to negotiate a "walkaway." You texted me on Friday that you had told George Brown that you were

PAGE 11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

dismissing the case. Accordingly, I contacted all defense counsel and requested a[] "walk away" (dismissal without you paying any costs or fees).

We have heard from most of the defendants and they are agreeable to the walk away. Keith Dubanevich, the lawyer for Legacy, said on behalf of Legacy – that they accept the walk away and want you to be a successful physician in Portland and anything they can do to help they will, and everyone needs to move on from this.

We believe that Dr. Keenen is also agreeable, based on comments from his attorney, and anticipate an email confirmation of an acceptance of the walk away shortly.

If you did abate the case, they very well might come back for costs and fees if you tried to dismiss it after abating it. Additionally, I would lose my credibility if I called to make such an offer after conveying your offer of a walk away (that has basically been accepted).

I have no doubt that your efforts are better spent on your career than putting any more energy into this litigation. I recall that you were hopeful that they would accept the walk away and they have basically done it. We should not mess with it.

Ex. 101-37.

31.     Although he received it promptly, Dr. Roberts did not respond to McDougal's

email until four days later, on Saturday, October 25, 2014, at 8:31 a.m., when Dr. Roberts sent an

email to both McDougal and Engelman. The entirety of Dr. Roberts's email reads:

Mark: I understand your points below. However, I do not want any final action on this case until we have a chance to speak. Thanks, Warren

Ex. 101-39. The Court finds it significant that, contrary to his later position, discussed below,

Dr. Roberts did not state in his email response on October 25th that McDougal did not have

Dr. Roberts's authority to offer to all Defendants the "walkaway" settlement. Although

Dr. Roberts explained during his testimony that he had been advised by Bonanno not to be

"confrontational" or "argumentative" with McDougal, the Court accepts as a reasonable

inference that if Dr. Roberts had believed on October 25th that McDougal had extended a

settlement offer without Dr. Roberts's express authority, Dr. Roberts would have somehow

communicated that belief to McDougal. The Court further finds it significant that Dr. Roberts did

not direct McDougal on October 25th to rescind or withdraw the "walkaway" settlement offer

that McDougal had already extended to Defendants on behalf of Plaintiffs.

32.    On Monday, October 27, at 9:13 a.m., Engelman forwarded Dr. Roberts's email

to McDougal. Ex. 101-41.

33.    McDougal returned from his vacation on November 3rd. Tr. 55 (McDougal). On

November 4th, Engelman sent Dr. Roberts an email stating: "Mark wants to meet next Tuesday.

Do you have time about 2pm?" Ex. 101-44.

34.    On November 4th, McDougal again spoke with counsel for Defendants

Dr. Soldevilla and Northwest Neurosurgical Associates. In his declaration, Scholz describes his

telephone conversation with McDougal as follows:

> On November 4, 2014 I spoke to Mr. McDougal again. I confirmed
> I would accept a letter from Mr. McDougal to the effect that
> plaintiffs were withdrawing all claims against Soldevilla without
> any payment made by Soldevilla or anyone on his behalf.
> Mr. McDougal said he had no objection to writing the letter as
> requested since what was requested was factually accurate.

Dkt. 128, ¶ 6 (Declaration of Robert D. Scholz). As explained by McDougal at the evidentiary

hearing, Dr. Soldevilla's counsel was seeking a letter "that basically restated the deal." Tr. 49

(McDougal). According to McDougal, that "was acceptable to me, but it is not my settlement.

But I thought it wouldn't change the terms of the deal, but I certainly was going to talk to

Dr. Roberts before I sent that letter out." Tr. 49 (McDougal).

35.    Dr. Roberts responded to Engelman on November 7th. Ex. 101-47. A meeting

was then arranged for Friday, November 14, 2014. Ex. 101-62. On the morning of November

14th, however, Dr. Roberts sent an email to Engelman stating that he was "seriously ill" and

needed to reschedule his meeting with McDougal. Ex. 101-76. Engelman responded by email:

"Give Mark a phone call right away. We need to give some information to the defense attorneys

today." Ex. 101-80.

      36.     On Friday, November 14th, McDougal and Engelman called Dr. Roberts from

Engelman's office and spoke with him while they were on a speakerphone. Tr. 22 (Engelman).

After the call concluded, Engelman prepared a memorandum to files, which summarized the call

and its background. Ex. 101-5 through 101-6. At the hearing, Engelman confirmed its accuracy.

Tr. 22 (Engelman). Engelman's memorandum to files reads:

> We had an office appointment scheduled with Dr. Roberts for
> today, but he emailed and cancelled. Mark called Dr. Roberts at
> 2:00 p.m. today, in my office on speaker phone with me present.
>
> Mark confirmed with Dr. Roberts that in the prior office
> consultation that Dr. Roberts had concurred that Mark would offer
> to the defendants to settle the case with a dismissal of the lawsuit,
> no costs or fees to anyone. This meeting was on a Thursday.
> Dr. Roberts agreed to that course of action. Mark then received a
> text message from Dr. Roberts on Friday that he had spoken with
> the CEO of Legacy and told him he was dismissing the lawsuit.
> Mark then consulted with every defense counsel and made the
> offer of settlement. By Monday (October 20) at least three counsel
> had accepted the offer via email; one verbally. By the end of the
> day Tuesday, the last attorney accepted the deal.
>
> On Monday, Oct 20 I received an email from Dr. Roberts asking
> for more time to consider case options and consider case
> abatement. Mark dictated a response email to Dr. Roberts basically
> indicating the deal was done. Dr. Roberts insisted on one more
> meeting before allowing/authorizing Mark to dismiss the case.
>
> That meeting was set for today (but Dr. Roberts canceled).
>
> *In the phone conference Dr. Roberts stated that he now does not
> feel that he should dismiss the lawsuit. He has had more time to
> think about it and does not want it dismissed.* He has two other
> lawyers he's consulted with about the case who might take it.

Mark made it very clear, repeatedly, that an offer of settlement had
been made and accepted and that if we do not file a dismissal, that
the defense counsel will immediately sue Dr. Roberts for breach of
contract. Mark also said that if Dr. Roberts did continue with the
lawsuit, after having made an offer of settlement which had been
accepted, that our firm was in a conflict and would have to
withdraw. He reminded Dr. Roberts that his deposition is set for
next week and that we would not/could not represent him in that.

Mark also indicated that there were only two things that needed to
be completed in the case: a letter for Dr. Soldevilla and sign/file
the notice of dismissal. Dr. Roberts said he understood.

Dr. Roberts again noted that he understood everything that Mark
was saying that that [*sic*] his emails were very clear that the offer
had been made/accepted and the settlement deal was done, but that
now was not how Dr. Roberts feels.

Dr. Roberts said he did not want to be at odds with Mark or our
firm, but that was not how he felt about the case. Dr. Roberts said
he wanted to make some calls and try to get a consult and back to
us by the end of business today. Mark said he could not do
anything because Dr. Roberts had instructed him not to do
anything, and again warned him that he would likely be sued for
breach of contract by the defense attorneys.

Ex. 101-5 through 101-6 (emphasis added). The Court finds it significant that, contrary to his

later position, Dr. Roberts did not state during this telephone call on November 14th that

McDougal did not have Dr. Roberts's authority to offer to all Defendants the "walkaway"

settlement that McDougal had offered and that had been accepted by Defendants.

37.    Engelman also testified that during this telephone call on November 14, she heard

Dr. Roberts say regarding the settlement, "I've changed my mind." Tr. 24 (Engleman). The

Court finds this testimony to be credible. The Court also notes that this testimony is consistent

with Engelman's contemporaneous memorandum to files, in which she wrote: "In the phone

conference Dr. Roberts stated that he now does not feel that he should dismiss the lawsuit. He

has had more time to think about it and does not want it dismissed." Ex. 101-5 through 101-6.

During the evidentiary hearing, Dr. Roberts denied saying that he had changed his mind or any

PAGE 15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

words to that effect, and he further stated that he has no idea to what Engleman could be referring. Tr. 92, 95 (Dr. Roberts). The Court finds Engelman's testimony to be more credible than the testimony of Dr. Roberts.

38.    On November 17, 2014, the law firm of Kafoury & McDougal moved to be relieved of its duties as attorneys of record for Plaintiffs and requested a stay of discovery to allow Plaintiffs time to associate new counsel. Dkt. 118. The Court granted that motion on November 18, 2014. Dkt. 120.

39.    On December 15, 2014, Defendants filed their Joint Motion to Enforce Settlement Agreement. Dkt. 123.

40.    On January 12, 2015, attorney Micah D. Fargey of Fargey Law PC appeared on behalf of Plaintiffs. Dkt. 133. Also on January 12, 2015, Plaintiffs opposed Defendants' Joint Motion to Enforce Settlement. Dkt. 134. Among other things, Plaintiffs argued that McDougal lacked the authority of Plaintiffs to extend any settlement offer to Defendants. Plaintiffs submitted the Declaration of Plaintiff Dr. Warren G. Roberts in opposition to Defendants' motion. Dkt. 135.

41.    In his declaration, Dr. Roberts stated:

1. I am one of the plaintiffs in this matter and owner of the other plaintiff, Aspen Spine and Neurosurgery Center, P.C. ("Aspen Spine"). I make this declaration in opposition to Defendants' "Joint Motion to Enforce Settlement Agreement." I have personal knowledge of the facts set forth below and, if called to testify, could and would testify competently to these facts.

2. I never offered to settle this lawsuit or accepted any settlement proffered by any of the defendants. I do not know why the defendants either believe or purport to believe this case is or was ever settled. It is not.

3. Dr. George Brown is, I understand, the CEO of Legacy Health System and a fellow African-American medical doctor. Dr. Brown and I are peers. I have had a number of conversations with him

PAGE 16 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

about the subject matter of this lawsuit and the challenges to my practice I believe were caused by the defendants' wrongful actions.

4.  Right around October 17, 2014, I had a brief conversation with Dr. Brown by telephone. I told him that I was considering dropping this lawsuit. I am not sure why exactly I said this, but I recall being drained by this lawsuit, my relationship with my former counsel, and the toll of the defendants' wrongful actions.

5.  Dr. Brown is not a party to this case and I did not believe that the substance of our conversation would be relayed to anyone. I did not ask him to tell anyone, let alone one or all of the defendants.

6.  I only told Dr. Brown that I was thinking about dropping the lawsuit (or considering it, I'm not sure) – but definitely not that I *wanted* to, *offered* to, or *would* settle, drop, or walk away from this lawsuit. I would never have made such an offer to the defendants.

7.  Additionally, I certainly did not state that Aspen Spine would settle or that I would attempt to settle on its behalf.

8.  Mark McDougal, my attorney, then learned that I had spoken to Dr. Brown. I did not in any way say or indicate that he should then attempt to offer or effectuate any settlement.

9.  I later discovered that Mr. McDougal, without my consent or knowledge, told all of the defendants that I offered to settle the case for nothing more than the defendants' agreement to drop their counterclaims, which I understand are only for attorney fees. I do not understand why he did this; I did not ask or authorize him to do so.

10.  When Mr. McDougal told me of this, I was shocked. I never offered or intended, explicitly, implicitly, actually, or apparently, any settlement of this case to the defendants.

11.  The defendants' actions have caused my practice to lose millions of dollars in economic damages, and I experienced significant non-economic damages from their actions. I would never agree or offer to settle this case for a walkaway.

12.  I understand the defendants are concerned that depositions were postponed because of their supposed belief that the case would be or was settled. If this is a concern, I will agree to grant additional time to finish discovery in this case.

Dkt. 135 (emphasis in original).

42.     Based on the testimonial and documentary evidence presented at the evidentiary hearing, the Court does not find credible Dr. Roberts's statements that: (1) "I never offered to settle this lawsuit"; (2) "I do not know why the defendants either believe or purport to believe this case is or was ever settled"; (3) "I only told Dr. Brown that I was thinking about dropping the lawsuit (or considering it, I'm not sure) – but definitely not that I wanted to, offered to, or would settle, drop, or walk away from this lawsuit. I would never have made such an offer to the defendants"; (4) "Mark McDougal, my attorney, then learned that I had spoken to Dr. Brown. I did not in any way say or indicate that he should then attempt to offer or effectuate any settlement"; (5) "I later discovered that Mr. McDougal, without my consent or knowledge, told all of the defendants that I offered to settle the case for nothing more than the defendants' agreement to drop their counterclaims, which I understand are only for attorney fees. I do not understand why he did this; I did not ask or authorize him to do so"; (6) "When Mr. McDougal told me of this, I was shocked. I never offered or intended, explicitly, implicitly, actually, or apparently, any settlement of this case to the defendants"; and (7) "I would never agree or offer to settle this case for a walkaway."

43.     On January 20, 2015, Defendants filed their Joint Motion to Declare Partial Waiver of Attorney-Client Privilege. Dkt. 137.

44.     After reviewing the briefing submitted by the parties, on April 10, 2015, the Court granted in part Defendants' Joint Motion to Declare Partial Waiver of Attorney-Client Privilege. Dkt. 144. In that ruling, the Court gave Dr. Roberts the option of deciding whether he intends to continue to rely on his statement that he did not authorize his then-counsel McDougal to extend the settlement offers that Defendants contend were extended and accepted. The Court explained that if Dr. Roberts intends to continue to place the attorney-client privilege at issue, then

appropriate discovery may be had. Dkt. 144. On April 17, 2015, Dr. Roberts gave notice of his

withdrawal of the declaration previously filed in opposition to Defendants' Joint Motion to

Enforce Settlement. Dkt. 145. On May 11, 2015, the Court granted Defendants' Joint Motion to

Enforce Settlement, Dkt. 148, and entered Judgment. Dkt. 149. On May 25, 2015, Plaintiffs

moved to set the judgment aside, arguing that they had only withdrawn Dr. Roberts's declaration

and had not withdrawn their argument that McDougal lacked settlement authority. Plaintiffs

argued that it was Defendants' burden to show that McDougal had settlement authority and that

Defendants had failed to satisfy that burden. On July 2, 2015, the Court granted Plaintiffs'

motion for relief from judgment and allowed Defendants to take appropriate discovery from

McDougal. Dkt. 161. In lieu of depositions, the parties sought an evidentiary hearing, which the

Court allowed.

      45.     The first day of the two-day evidentiary hearing was held on August 6, 2015.

Witnesses Mark McDougal and George Brown, M.D. testified, and Exhibits 101-106 were

received. The second day of the evidentiary hearing was held on September 11, 2015. Witnesses

Donna Engelman and Warren G. Roberts, M.D. testified, and Exhibits 1, 107, and 108 were

received. The facts found by the Court and described above in paragraphs 7, 10-37 and 42 above

are based on the testimony and exhibits received during this two-day evidentiary hearing. In

addition to the express credibility findings stated in paragraphs 18, 37, and 42, when the

testimony of Dr. Roberts is materially inconsistent with the testimony of McDougal, Dr. Brown,

or Engelman, the Court accepts and finds more credible and persuasive the testimony of

McDougal, Dr. Brown, and Engelman.

## CONCLUSIONS OF LAW

      1.     "It is well settled that a district court has the equitable power to enforce

summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890

(9th Cir. 1987); *see also In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994) (describing such authority as "a trial court's inherent enforcement power").

2.       Although a motion to enforce a settlement agreement sometimes may be decided summarily based only on the papers, *see, e.g., Doi v. Halekulani Corp.*, 276 F.3d 1131 (9th Cir. 2002), "[w]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Callie*, 829 F.2d at 890.

3.       A "motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract." *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989). "An action for specific performance without a claim for damages is purely equitable and historically has always been tried to the court." *Id*. (quotation marks omitted). "This is so even if the party resisting specific enforcement disputes the formation of the contract." *Id*. at 709-10. Indeed, the Ninth Circuit has expressly rejected the contention that a motion to enforce a settlement agreement is protected by a "constitutional right to a jury trial." *Id*. at 710. Rather, such motions are to be decided by the court in evidentiary hearings. *Id*. at 709-10; *see also Callie*, 829 F.2d at 891 (directing the district court to "resolve the factual dispute" from the testimony of the parties over whether there was a "meeting of minds sufficient to effect a settlement agreement").

4.       The question of a party's entitlement to a jury trial is determined by federal law in a diversity action. *Adams*, 876 F.2d at 709. The same result, however, would be reached under Oregon law. In *Kaiser Foundation Health Plan v. Doe*, 136 Or. App. 566, 568-70 (1995), a party's request for specific enforcement of an alleged oral settlement agreement was resolved by a trial to the court, and no mention was made by the appellate court of any right to a jury trial.

5.      Oregon courts subscribe to the objective theory of contracts, which "provides that the existence and terms of a contract are determined by evidence of the parties' communications and acts." *Rhoades v. Beck*, 260 Or. App. 569, 572 (2014). A party's subjective understanding that no agreement was reached does not preclude the trial court from finding that the evidence objectively established the existence of an agreement. *Id.* at 573.

6.      "Although the question whether an enforceable contract exists ultimately is one of law, the underlying issue—whether the parties had a 'meeting of the minds'—is one of fact." *Clement v. Mills*, 245 Or. App. 308, 310 (2011).

7.      An acceptance that attempts to change, add to, or qualify the *material* terms of an offer will not result in a contract being formed by the parties. *Northwestern Agencies, Inc. v. Flynn*, 138 Or. 101, 105 (1931) ("To constitute a binding acceptance of an offer, every *material* condition prescribed by the offer must be met, nor shall there be any *material* variance from the terms of the offer.") (emphasis added); *see also Raydon Exploration, Inc. v. Ladd*, 902 F.2d 1496, 1500 (10th Cir. 1990) (applying Oklahoma law and noting "[i]mmaterial variances between the offer and acceptance will be disregarded and the mere addition of a collateral or immaterial matters [*sic*] will not prevent the formation of a contract").

8.      Counsel for Dr. Soldevilla requested a letter confirming "that plaintiffs were withdrawing all claims against Soldevilla without any payment made by Soldevilla or anyone on his behalf." Dkt. 128, ¶ 6. Plaintiffs argue that defense counsel's request for such a letter was not an acceptance of Plaintiffs' settlement offer, but rather a rejection of the settlement offer by counteroffer. Dr. Soldevilla's request for such a letter, however, did not change, add to, or qualify the material terms of the settlement agreement. The letter merely requested a writing that confirmed the essential terms of the settlement agreement, which does not affect the proposed

agreement's material provisions.[4] "When parties agree on the essential terms of a contract and there is nothing left for future negotiations, the fact that they also intended there to be a future writing that expresses their agreement more formally does not affect the immediately binding nature of the agreement." *Hughes v. Misar*, 189 Or. App. 258, 264 (2003) (citing *Britt v. Thorsen*, 258 Or. 135, 137 (1971)).

9.    When Plaintiffs' then-counsel, McDougal, extended Plaintiffs' settlement offer of a complete and mutual "walkaway dismissal" to the various counsel for Defendants on October 17, 2014, McDougal had the actual authority of Plaintiffs to extend that offer.

10.    During the week of October 20, 2014, all Defendants, through their respective counsel, communicated to McDougal's office that Defendants accepted Plaintiffs' settlement offer. Because Dr. Soldevilla and Northwest Neurosurgical Associates, through their counsel Scholz, merely requested a writing that confirmed the essential terms of the settlement agreement being offered by Plaintiffs, the request for such a letter did not constitute a material variance between the offer and the acceptance and thus was not a rejection by counteroffer. As an immaterial variance, it may be disregarded, and it did not prevent the formation of a binding agreement to settle the dispute on the terms offered by Plaintiffs through their then-counsel, McDougal. To the extent that there may have been some ambiguity in Scholz's email of October 20th about what Dr. Soldevilla and Northwest Neurosurgical Associates were

---

[4] "A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 139 (2006) (quotation marks omitted) (considering whether the material terms of an agreement were sufficiently definite to require specific performance). "Whether a contractual term is material 'is a question for the factfinder unless the uncontested evidence leads to only one legal conclusion.'" *Id.* at 140. To the extent necessary, the Court also finds as a Finding of Fact that the letter requested by Dr. Soldevilla along with his acceptance was not a material variance from Plaintiffs' settlement offer.

PAGE 22 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

requesting, any such ambiguity was clarified when Scholz and McDougal spoke by telephone on November 4, 2014.[5]

11.    Although Dr. Roberts told McDougal by email on the morning of October 20th that Dr. Roberts did not want the case to be dismissed "until we have a chance to discuss this," Dr. Roberts did not direct McDougal to rescind, revoke, or terminate the settlement offer that on October 17th he had authorized McDougal to extend to Defendants on behalf of Plaintiffs. In response, McDougal sent an email to Dr. Roberts on October 21st informing him that all defense counsel had already been contacted and that most Defendants had already indicated that they are agreeable to a walkaway settlement. After waiting four days to respond, Dr. Roberts wrote back to McDougal on October 25th stating: "I understand your points below. However, I do not want any final action on this case until we have a chance to speak. Thanks." Again, Dr. Roberts did not direct McDougal to rescind, revoke, or terminate the settlement offer that Dr. Roberts previously had authorized McDougal to extend to Defendants. It was not until November 14, 2014, that Dr. Roberts told McDougal and Engelman that he had changed his mind and no longer wanted to dismiss his lawsuit under the settlement terms that he had previously authorized. By that time, however, Plaintiffs' settlement offer had already been accepted by all Defendants. There is no dispute that this offer and acceptance contained valid consideration. Further, there was detrimental reliance on the part of Defendants.

12.    The parties to this lawsuit have entered into a valid and enforceable settlement agreement to dismiss with prejudice all claims and counterclaims and without any fees, costs, or other compensation being paid by any Defendant to any Plaintiff or by any Plaintiff to any

---

[5] *See* n. 4, *supra*.

Defendant. There are no equitable grounds to deny enforcement of this settlement agreement. It shall be enforced.

## CONCLUSION

Defendants' Joint Motion to Enforce Settlement Agreement (Dkt. 123) is GRANTED. This case is dismissed with prejudice. Each party shall bear its own attorney's fees, costs, and expenses.

**IT IS SO ORDERED**.

DATED this 5th day of October, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge